*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0156P (6th Cir.)
File Name: 02a0156p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

                    *v.*                          No. 00-6266

TIMOTHY MARTIN,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 99-00029—Karl S. Forester, Chief District Judge.

Submitted: February 1, 2002

Decided and Filed: May 6, 2002

Before: MARTIN, Chief Circuit Judge; GILMAN, Circuit
Judge; EDMUNDS, District Judge.[*]

———————————

**COUNSEL**

**ON BRIEF:** Charles P. Wisdom, Jr., ASSISTANT UNITED
STATES ATTORNEY, Lexington, Kentucky, Laura K.
Voorhees, ASSISTANT UNITED STATES ATTORNEY,

---

[*] The Honorable Nancy G. Edmunds, United States District Judge for
the Eastern District of Michigan, sitting by designation.

1

Covington, Kentucky, for Appellant.  James Stephen Smith, ZIEGLER & SCHNEIDER, Covington, Kentucky, for Appellee.

EDMUNDS, D. J., delivered the opinion of the court, in which GILMAN, J., joined.  MARTIN, C. J. (pp. 12-14), delivered a separate dissenting opinion.

————————

## OPINION

————————

NANCY G. EDMUNDS, District Judge.  The United States appeals the district court's ruling to suppress a handgun seized during a car stop.  For the reasons stated below, this panel REVERSES and REMANDS.

## I.  BACKGROUND

On January 18, 1999 at approximately 9:20 p.m., officers William Maurer and Gregory Jones of the Covington, Kentucky police department were traveling in an undercover police car on East 8th Street in Covington, Kentucky.  They observed a woman, Virginia Wagoner ("Wagoner"), enter a vehicle driven by Defendant-Appellee Timothy Martin ("Martin").  The officers testified that they initially observed Wagoner either standing or slowly walking outside wearing nothing more than jeans and a short-sleeved shirt; she was located in front of a parking lot, carrying nothing except a cigarette.[1]  According to the officers, the fact that Wagoner was not carrying a purse was significant because prostitutes generally do not carry purses.  They also testified that they believed Wagoner had been arrested on prostitution charges in the past.

——————————————

[1] The evening's weather was described by the officers as "cool" but not "cold"; Covington, Kentucky was experiencing a "mild" winter.

wave, combined with the nature of the neighborhood, their belief about Wagoner's prior arrest and Wagoner's failure to carry a purse, justified their stop of Wagoner. The underlying facts simply leave too much to speculation about whether Wagoner was engaged in loitering for prostitution purposes in this particular instance. Perhaps if the police officers had continued to observe Wagoner, they might have witnessed additional factors that would have supplied the necessary suspicion, but under the present circumstances, I do not believe the police officers could permissibly stop Wagoner. Accordingly, I would affirm the district court's decision.[2]

---

[2]Because I do not believe the police officers had reasonable suspicion to stop Wagoner, I would not reach the probable cause issue addressed by the majority opinion.

The officers characterized the area as one known for prostitution, where police routinely conduct undercover prostitution investigations. According to the officers, Wagoner extended her right hand "about waist high" and waved at Martin's vehicle in a manner that the officers recognized to be a prostitute's hailing of a prospective John. Wagoner then entered Martin's vehicle and the two proceeded to drive off. Based upon these facts, the officers suspected that Wagoner was loitering for prostitution purposes, so they requested that officer Gene Neal, who was located hereby in a marked police cruiser, stop Martin's vehicle.

After Neal made the stop, Maurer removed Wagoner from the vehicle and interrogated her as they stood on the sidewalk. Wagoner told Maurer that she had met Martin, known to her only by his first name, at her brother's house approximately one year earlier. She also admitted that she had prior convictions for prostitution and for possession of cocaine. Maurer then interrogated Martin, who told him that he had known Wagoner for two months and that he had met her on one of his walks in the area. The officers testified that Martin could not tell them Wagoner's name.

While Maurer was questioning Martin, officer Jones obtained consent from Wagoner to search her person, at which time he discovered a condom in her pocket. After Maurer and Jones conferred, Wagoner was arrested and charged with loitering for prostitution purposes, a misdemeanor under Kentucky law if the crime is a second offense. Officer Wesley Cook, who had subsequently responded to the scene, then searched the passenger area of the automobile and discovered a .25 caliber semi-automatic pistol beneath the rear passenger floor-mat. Because the officer never observed Wagoner turn around or lean over her seat while seated in the front passenger seat, they concluded that the gun belonged to Martin and charged him with carrying a concealed deadly weapon. After it was determined that Martin had at least one prior felony conviction, he was charged with the federal offense of felon in possession of a firearm.

Martin argues that the discovery of the firearm was made in violation of both the Fourth Amendment to the United States Constitution and Section 10 of the Kentucky Constitution. Specifically, Martin argues: (1) the officers lacked reasonable suspicion to stop the car; (2) the interrogation of Martin and Wagoner did not create probable cause to arrest Wagoner; and (3) the search of the car did not satisfy any exception to the warrant requirement because there was no probable cause to search the vehicle, nor was the area behind the passenger seat within Wagoner's immediate control.

In response, the government argues that: (1) the officers had a legal basis to stop Wagoner based on their reasonable suspicion that the crime of loitering for purposes of prostitution was being committed; (2) the officers had probable cause to arrest Wagoner after interrogating her and Martin; (3) independent of the search incident to the arrest, the officers had probable cause to search the vehicle for contraband or evidence of a crime; and (4) the officers had probable cause to arrest Martin for the crime of carrying a concealed deadly weapon.

The district court conducted a suppression hearing and thereafter granted Martin's motion to suppress, based on an analysis of the car stop and the search incident to Wagoner's arrest. We conclude that the district court erred in finding that the officers lacked reasonable suspicion to justify the stop of Martin's car and in finding that the officers lacked probable cause to arrest Wagoner.

## II. ANALYSIS

### A. Standard of Review

In reviewing a district court's determination on suppression questions, "a district court's factual findings are accepted unless they are clearly erroneous...." *United States v. Shamaeizadeh,* 80 F.3d 1131, 1135 (6th Cir. 1996)(citations omitted). The district court's "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

woman who been convicted of prostitution crimes in the past." Maj. Op. at 9. But the district court's findings reflected that the officers "*believed* that Wagoner had been *arrested* on prostitution charges in the past." District Ct. Op. at 1. Moreover, the officers's suppression hearing testimony reveals that one of the officers based his belief on department photographs and that the other officer could not specify the source of his belief. J.A. 42, 68.

In *United States v. Byrd*, No. 94-5301, 1995 WL 72299 (6th Cir. Feb. 21, 1995), our only prior opinion addressing reasonable suspicion in the prostitution context, we held that the police could constitutionally stop a woman on suspicion of prostitution. The officers observed the suspect, a known prostitute whom they had told earlier to get off the streets, lean into the passenger window of a car stopped in the middle of the street at 3:30 a.m. *Id.* at *3.

Our state court counterparts, who ordinarily handle prostitution cases, have relied on similar combinations of particularized facts in approving investigatory stops. In *State v. Goldstein*, for example, the court ruled that the police had reasonable suspicion to stop a car where (1) the police observed the car driving aimlessly (2) the car stopped and the driver engaged in a brief conversation with a known prostitute; (3) the known prostitute stepped into the car; (4) the car made a series of furtive movements when it spotted the police officers. *State v. Goldstein*, No. 12130, 1991 WL 1674, at *1 (Ohio App. 2 Dist., Jan. 11, 1991); *see also City of Cleveland v. Harmon*, No. 91-TRC-54308A-C, 1993 WL 489752, at *2 (Ohio App. 8 Dist., Nov. 24, 1993) (relying on time of day [3:19 a.m.], the reputation of the area, the gender of the vehicle's occupants [male and female] and the fact that the vehicle was illegally parked).

Considering the totality of the circumstances in light of *Byrd* and its state court analogs, I do not believe that the police officers had the particularized, reasonable suspicion to justify a stop. While I credit the officers's experience and expertise, I do not believe that their interpretation of the

---

### DISSENT

---

BOYCE F. MARTIN, JR., Chief Circuit Judge, dissenting.

I respectfully dissent. I believe the district court correctly determined that the police lacked reasonable suspicion to stop Wagoner and that the firearm seized from Martin should be suppressed as the fruit of an unlawful search.

Before evaluating the totality of the circumstances, I note two points regarding the majority's characterization of the facts underlying the stop. The majority relies on four factors in reaching its decision – (1) Wagoner's "dress and attire were typical of prostitutes; (2) she was in an area known for prostitution activity; (3) [the police officers] recognized her as a woman who had been convicted of prostitution crimes in the past; and (4) she waved in a manner that [the police officers] identified as being characteristic of a prostitute's means of soliciting customers." Maj. Op. at 9. Initially, I note that there is no indication in the district court's factual findings or in the arresting officers's suppression hearing testimony that Wagoner's "dress" was "typical of prostitutes." The district court simply noted that Wagoner was wearing jeans and a short-sleeved t-shirt on a cool night. District Court Op. at 1. While the government characterizes jeans and a short-sleeved t-shirt as "scantily clothed," there is no record evidence supporting the government's assertion or otherwise indicating such an outfit was more typical of a prostitute than any other Covington resident.[1]

The majority opinion also airbrushes the police officers knowledge regarding Wagoner's prior purported prostitution activity. It asserts "the officers recognized [Wagoner] as a

---

[1] With respect to attire, the officers testified that most prostitutes do not carry personal belongings such as a purse or bag and that Wagoner was not carrying a purse. J.A. 12, 70.

### B.  The Car Stop

"The Fourth Amendment prohibits unreasonable searches and seizures." *United States v. Obasa*, 15 F.3d 603, 606 (6th Cir.1994). However, a brief investigative stop, or *Terry* stop, by an officer who is able to point to "'specific and articulable facts'" justifying his or her reasonable suspicion that the suspect has been or is about to be involved in criminal activity is not an unreasonable seizure. *United States v. Sokolow*, 490 U.S. 1, 12 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). While "the Fourth Amendment requires that the decision to stop the individual be based on something 'more substantial than inarticulate hunches[,]' ... 'the totality of the circumstances--the whole picture--must be taken into account'" in determining the validity of a challenged stop. *United States v. Roberts*, 986 F.2d 1026, 1029 (6th Cir.) (quoting *Terry*, 392 U.S. at 22).

The scope of law enforcement activities in an investigative stop depends upon the circumstances that originally justified the stop. *See United States v. Obasa*, 15 F.3d 603, 607 (6th Cir.1994). "Thus, the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released." *Id.* (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439-40, (1984) (internal quotations omitted)).

This Court evaluates the legitimacy of the investigatory stop by making a two-part assessment of its reasonableness. First, the Court must determine whether there was a proper basis to stop the individual based upon the officer's "aware[ness] of specific and articulable facts which gave rise to a reasonable suspicion." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir.1993) (quotation omitted). Second, the Court must evaluate "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the

reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.* (quotation omitted).

Generally speaking, courts do not separately scrutinize each factor relied on by the officer conducting the search. *See Sokolow, supra* at 8-9. The fact that a given locale is well known for criminal activity will not *by itself* justify a *Terry* stop; but it is among the various factors that officers may take into account. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)(emphasizing that an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," but stressing that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation").

The Supreme Court recently clarified how the totality of the circumstances test should be applied in *United States v. Arvizu*, 122 S.Ct. 744 (2002). In *Arvizu*, a border patrol agent was found to have reasonable suspicion to conduct a car stop where: the stop occurred in a remote area of rural southeastern Arizona, an area known by law enforcement to be frequented by drug smugglers; defendant was driving a minivan, a vehicle known to be used be drug smugglers; time of day indicated that defendant intended to pass through area during agents' shift change.

Furthermore, the border patrol agent saw five occupants in the minivan; an adult man was driving, an adult woman sat in the front passenger seat, and three children were in the back. Despite the appearance of a family outing, defendant's vehicle had turned away from known recreational areas. The agent observed that the knees of the two children sitting in the very back seat were unusually high, as if their feet were propped up on some cargo on the floor. At that point, the border patrol agent decided to get a closer look, so he began to follow the vehicle. Shortly thereafter, all of the children, though still facing forward, put their hands up and began to wave at the

contradictory answers regarding how they met and how long they had known each other. Moreover, Wagoner knew Martin's name, but he did not know her name. The consensual search of Wagoner revealed that she was carrying a condom in her pocket, but had no other possessions. This Court finds that these factors provided probable cause for the officers to arrest Wagoner for loitering for the purpose of prostitution.

Although innocent explanations for some or all of these facts may exist, this possibility does not render the officers' determination of probable cause invalid. *See Reed,* 220 F.3d at 478 (noting that "[o]fficers are not required to rule out every possible explanation other than a suspects illegal conduct before making an arrest"); *United States v. Strickland*, 144 F.3d 412, 416 (6th Cir. 1998)(noting that "the probable cause requirement does not require that [police officers] possess evidence sufficient to establish guilt beyond a reasonable doubt."). As this Court has explained, "the Fourth Amendment does not require that a police officer *know* a crime has occurred at the time the officer arrests or searches a suspect." *Strickland*, 144 F.3d at 415 (emphasis in original). The fact that Wagoner was no longer loitering when the officers' reasonable suspicion transformed into probable cause to arrest her, moreover, does not render their arrest unlawful, because the officers observed her loitering prior to arresting her.

Because police officers may conduct a search of an automobile after a lawful custodial arrest of the vehicle's occupant, the search of Martin's car that resulted in the discovery of the firearm was a lawful search incident to arrest. *See New York v. Belton*, 453 U.S. 454, 460 (1981). Therefore, this Court reverses the district court on this issue as well.

## III. CONCLUSION

For the reasons stated above, this Court REVERSES the district court's ruling to suppress the handgun and REMANDS this case for further proceedings.

Under Kentucky law, one is guilty of loitering for the purpose of prostitution when "he loiters or remains in a public place for the purpose of engaging or agreeing or offering to engage in prostitution." Ky. Rev. Stat. § 529.080. This crime is classified as a violation for the first offense and a class B misdemeanor for each subsequent offense. *Id.* The district court relied on the fact that in Kentucky, an officer may only make an arrest without a warrant when a misdemeanor has been committed in his presence. Ky. Rev. Stat. § 431.005. However, this requirement does not affect the outcome of the present case. *See United States v. Wright*, 16 F.3d 1429, 1437 (6th Cir. 1994)(holding that "the appropriate inquiry for a federal court considering a motion to suppress evidence seized by state police officers is whether the arrest, search, or seizure violated the Fourth Amendment. The fact that the arrest, search, or seizure may have violated state law is irrelevant as long as the standards developed under the Federal Constitution were not offended.").

The district court erred in ruling that the interrogation of Wagoner and Martin, combined with the discovery of a condom in Wagoner's pocket and the officers' knowledge of her prior prostitution and drug convictions did not create probable cause to arrest Wagoner for the crime of loitering for prostitution purposes. In *Klein v. Blackman,* 2001 WL 1635898 (6th Cir. Dec. 21, 2001) this Court stated that "probable cause is assessed from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and thus probable cause determinations involve an examination of all facts and circumstances within an officer's knowledge at the time of an arrest." "The threshold for probable cause is based upon factual and practical considerations of everyday life that could lead a reasonable person to believe that there is a probability than an illegal act has occurred or is about to occur." *United States v. Reed*, 220 F.3d 476, 478 (6th Cir. 2000).

In addition to the factors that supported the officers' reasonable suspicion that Wagoner was loitering for the purpose of prostitution, Martin and Wagoner provided

agent in an abnormal pattern; the agent testified that the children appeared to be waving as if instructed to do so.

The agent next radioed for a registration check on the vehicle and learned that the minivan was registered to an address four blocks north of the border, an area known by law enforcement to be notorious for alien and narcotics smuggling. After receiving this information, the agent decided to make a vehicle stop. The agent stopped the vehicle and received permission from the driver to search the vehicle. During his search of the vehicle, the agent found 128.85 pounds of marijuana in the vehicle. Arvizu, the driver of the vehicle, moved to suppress the marijuana, arguing among other things, that the border patrol agent did not have reasonable suspicion to stop the vehicle as required by the Fourth Amendment.

The District Court for the Northern District of Arizona ruled against Arvizu. The Court of Appeals for the Ninth Circuit reversed. *See* 232 F.3d 1241. In the Ninth Circuit's view, fact-specific weighing of circumstances or other multifactor tests introduced "a troubling degree of uncertainty and unpredictability" into the Fourth Amendment analysis. *Id.*, at 1248 (internal quotation marks omitted).

The Supreme Court overruled the Ninth Circuit by stating:

We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the "totality of the circumstances," as our cases have understood that phrase. The court appeared to believe that each observation by [the border patrol agent] that was by itself readily susceptible to an innocent explanation was entitled to "no weight." *See* 232 F.3d, at 1249-1251. *Terry*, however, precludes this sort of divide-and-conquer analysis. The officer in *Terry* observed the petitioner and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of

acts was "perhaps innocent in itself," we held that, taken together, they "warranted further investigation." 392 U.S., at 22, 88 S.Ct. 1868. *See also Sokolow, supra*, at 9, 109 S.Ct. 1581 (holding that factors which by themselves were "quite consistent with innocent travel" collectively amounted to reasonable suspicion).

*Arvizu*, 122 S.Ct. 744, 751.

Thus, *Arvizu* made clear that courts must not view factors upon which police officers rely to create reasonable suspicion in isolation. Rather, *Arvizu* stressed that courts must consider all of the officers observations, and not discard those that may seem insignificant or troubling when viewed standing alone.

Furthermore, in *Arvizu*, the Supreme Court reiterated that the totality of the circumstances approach allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person. *See Arvizu* at 752; *see also Ornelas v. United States*, 517 U.S. 690, 699 (1996)(reviewing court must give "due weight" to factual inferences drawn by local law enforcement officers).

In *United States v. Byrd*, 1995 WL 72299 (6th Cir. Feb. 21, 1995), this Court considered the constitutionality of a vehicle stop made in order to investigate suspected prostitution activity. While *Byrd* upheld the constitutionality of the vehicle stop, the district court distinguished *Byrd* from the present case on four separate grounds. The district court stated:

First, the woman in *Byrd* had been told earlier that night to get off the streets, while Wagoner had not; the officers' only knowledge of Wagoner was that they believed she had been arrested in the past for prostitution. Second, the car in *Byrd* was observed immobile in the middle of the street, which itself was probably a separate traffic violation, while the defendant committed no such traffic offense in the present case. Third, the events in *Byrd* took place at 3:30 a.m., while

the present incident occurred at 9:20 p.m. Fourth, and most importantly, the woman in *Byrd* was observed leaning in the window talking to Byrd, while Wagoner simply waved at defendant.

*Opinion and Order* at 4-5; APX 28-29.

Although these differences between *Byrd* and the present case exist, the fact that the officers in the present case did not have the same degree of suspicion that illegal prostitution activity was occurring as the officers in *Byrd* had does not mean that they lacked reasonable suspicion.

The officers testified that they believed that Wagoner was engaged in the offense of loitering for prostitution because: (1) her dress and attire were typical of prostitutes; (2) she was in an area known for prostitution activity; (3) they recognized her as a woman who had been convicted of prostitution crimes in the past; and (4) she waved in a manner that they identified as being characteristic of a prostitute's means of soliciting customers. This Court finds that the combination the above observations, when considered from the perspective of officers with specialized training and familiarity with the behavior of prostitutes, provide reasonable suspicion to justify a stop. *See Arvizu, supra; Ornelas, supra; see also United States v. Cortez*, 449 U.S. 411, 417 (1981)(evidence is to be viewed by those versed in the field of law enforcement).

## C. The Search

In *New York v. Belton*, 453 U.S. 454 (1981), the Supreme Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." *Id.* at 460 (footnote omitted). The officer may also search the contents of any containers found within that passenger compartment. *Id.* Therefore, in the present case, the officers' ability to constitutionally search Martin's vehicle can exist only if they could have lawfully arrested Wagoner. This Court finds that the officers could have lawfully arrested Wagoner, therefore the officers' search of Martin's vehicle was permissible.