RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 08a0144p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 06-3943

ABDUS SALAAM LUQMAN, a/k/a THOMAS A. MACK,
*Defendant-Appellant.*

>

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 05-00571—John R. Adams, District Judge.

Argued: January 29, 2008

Decided and Filed: April 8, 2008

Before: SILER, CLAY, and COOK, Circuit Judges.

---

## COUNSEL

**ARGUED:** Edward G. Bryan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Thomas M. Bauer, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee. **ON BRIEF:** Edward G. Bryan, FEDERAL PUBLIC DEFENDER'S OFFICE, Cleveland, Ohio, for Appellant. Thomas M. Bauer, ASSISTANT UNITED STATES ATTORNEY, Akron, Ohio, for Appellee.

SILER, J., delivered the opinion of the court, in which COOK, J., joined. CLAY, J. (pp. 6-10), delivered a separate dissenting opinion.

---

## OPINION

---

SILER, Circuit Judge. Two police officers stopped Defendant Abdus Salaam Luqman's pickup truck when the officers suspected Luqman of soliciting prostitution. After questioning Luqman, the officers verified Luqman's driver's license, which was suspended. The officers then arrested Luqman for driving with a suspended license and conducted a routine, pre-tow inventory of Luqman's truck, when the officers found a concealed handgun. Luqman was later indicted for possession of a firearm by a convicted felon under 18 U.S.C. § 922(g)(1). The district court denied Luqman's motion to suppress the firearm. Luqman now appeals his subsequent conviction, arguing that the police officers did not have reasonable suspicion to stop his truck.

For the following reasons, we AFFIRM.

1

FACTUAL AND PROCEDURAL BACKGROUND

In August 2005, two Akron police officers, James Donohue and Angela Falcone, were patrolling the city's North Hill area. The officers were seasoned members of the police force; Donohue and Falcon had patrolled Akron for nine and six years, respectively. Donohue had also spent two months working in the police department's undercover vice unit, investigating prostitution as a "John," or potential client, in the North Hill area. According to Donohue, North Hill was a known prostitution area.[1]

At approximately 11:40 p.m. on August 19, 2005, Donohue noticed two African-American women standing on a street corner in North Hill; Falcone did not see the women, as she was looking at the computer screen in the patrol car. As the patrol car proceeded up the street, Donohue noticed that one of the women left the street corner to approach a pickup truck driven by Luqman. The truck was approximately twenty yards from the street corner when the woman approached. The truck was not parked, but rather in the travel lane with its engine running. Donohue believed that the women were prostitutes[2] and the driver of the truck was soliciting prostitution. As the truck was on the opposite side of the street from that of the patrol car, Donohue made a U-turn. As he did so, the woman ran[3] from the truck back to the sidewalk. The truck then began to move, and Donohue pulled the patrol car behind the truck.

After the truck stopped, Donohue asked Luqman what he was doing in the neighborhood, to which Luqman responded that he was looking for a friend. Donohue asked Luqman if he was soliciting prostitution, and Luqman replied that he was not. Donohue then asked Luqman for his driver's license. Donohue verified the license and identified the driver as Luqman. The license, however, was suspended, and upon learning this, the officers arrested Luqman for driving with a suspended license.

Following Akron police department regulations, Falcone conducted a pre-tow inventory of Luqman's truck and found a handgun under the driver's seat. The police officers then charged Luqman with carrying a concealed weapon.

After indictment in federal court, Luqman filed a motion to suppress the arrest and search, arguing that the police officers did not have the requisite reasonable suspicion to stop him. The district court denied the motion. Luqman was found guilty, and the district court later sentenced him to a 180-month imprisonment term.

STANDARDS OF REVIEW

As a grant or denial of a motion to suppress is a mixed question of fact and law, we review the district court's decision under two standards. *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir.

---

[1] The dissent says the Government conceded at argument that North Hill is not a "high prostitution area," but Donohue said it was a "known prostitution area," evidenced by six arrests in one year. This is language similar to the conclusion by our court in *United States v. Green*, 157 F. App'x 853, 855 (6th Cir. 2005): "Officer . . . Sharp . . . saw a woman leaning close to the passenger side of a car that had stopped in an area known for drug trafficking and prostitution." Such information must have come from the investigating officers in that case, although the opinion does not say so.

[2] The dissent suggests that because the suspected prostitutes were not dressed provocatively, they did not present the outward appearance of a prostitute. However, Donohue testified that in his experience most of the prostitutes he observed in Akron did not dress provocatively, but, instead, are most likely to wear jeans and a sweatshirt or a T-shirt.

[3] The dissent distinguishes this case from *Green*, 157 F. App'x at 855, where the suspected prostitute "left abruptly," but Donohue testified that the suspected prostitute in this case "ran" away from the truck.

2007). "On appeal, we review the district court's findings of fact for clear error and its conclusions of law de novo." *Id.* (citing *United States v. Dillard*, 438 F.3d 675, 680 (6th Cir. 2006)).

## DISCUSSION

The defense gives us no reason to question the district court's interpretation of the facts in this case, nor can one find such a basis independently. As such, we adopt the facts as found by the district court and turn to the sole question of whether the officers were justified in stopping Luqman. *See United States v. Martin*, 289 F.3d 392, 396 (6th Cir. 2002) (noting that this court accepts the factual findings of the district court unless those findings are clearly erroneous).

The Fourth Amendment forbids law enforcement officers from making unreasonable searches and seizures, "and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968)) (holding that a stop was constitutional after Border Patrol agents observed defendant's crowded van, of the type used for smuggling illegal immigrants, in a remote area of Arizona, at the time of day illegal entries are usually attempted). The Fourth Amendment's protections are satisfied if the law enforcement officers' actions are "supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *Id.* (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

There is not a bright-line rule to determine whether an officer had reasonable suspicion. *Ellis*, 497 F.3d at 612. Instead, we look to the totality of the circumstances surrounding the stop to determine whether the officer had a "particularized and objective basis" for suspecting criminal activity. *Id.* at 613 (quoting *Arvizu*, 534 U.S. at 266). In evaluating the totality of the circumstances, we will not look at each factor leading to the stop individually; rather, we examine the factors as a whole. *Id.* at 614 ("A totality of the circumstances analysis prohibits us from discounting certain factors merely because, separately, they could potentially have 'an innocent explanation.'" (quoting *Arvizu*, 534 U.S. at 267)). We also give "due weight" to the officers' factual inferences, as their specialized training and experiences allow them to draw "inferences from and deductions about the cumulative information available to [them] that 'might well elude an untrained person.'" *United States v. Marxen*, 410 F.3d 326, 331-32 (6th Cir. 2005) (quoting *Arvizu*, 534 U.S. at 273).

We also utilize a two-part test to determine the legitimacy of an investigatory stop. First, we must determine if there was a proper basis to stop Luqman based on the police officers' awareness of specific and articulable facts that give rise to reasonable suspicion. *Martin*, 289 F.3d at 397 (quoting *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993)). Second, we evaluate "whether the degree of intrusion into the suspect's personal security was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *Id.*

Here, looking to the totality of the circumstances surrounding Donohue's stop of Luqman, the officer had reasonable suspicion to stop Luqman for solicitation of prostitution. First, the officers were patrolling a known prostitution area, and while the criminal patterns in an area will not alone justify a stop, they are a factor that law enforcement can consider. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation."). Taking this location into consideration, and combined with his previous vice experience, Donohue suspected the two women were prostitutes when he saw them standing on the street corner in North Hill, and then saw one of the women approaching a truck. His suspicions were further piqued when the woman who had approached the truck ran back to the corner, and Luqman's truck moved forward, as the police vehicle approached. Flight from a known area of

criminal activity is another aspect that an officer may consider. *See id.* ("Headlong flight–wherever it occurs–is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). While certainly Luqman can create any number of possible innocent explanations for these actions, we need not adopt those singular explanations. Rather, the question is whether, when looking at the facts in total, the officers had reason to believe that criminal activity was afoot. The answer here is yes.

Luqman contends that this case involves a weaker factual basis for the stop than previous cases involving stops for solicitation of prostitution that he cites, and in that respect he may be correct. But, as we have noted, "[T]he fact that the officers in the present case did not have the same degree of suspicion that illegal prostitution activity was occurring as the officers in [another case] had does not mean that they lacked reasonable suspicion." *Martin*, 289 F.3d at 399.

Further, in a case nearly identical to this one, we held that the arresting officers did have the requisite reasonable suspicion to stop the defendant. In *United States v. Green*, 157 F. App'x 853, 855 (6th Cir. 2005) (unpublished decision), an officer was patrolling an area known for drug trafficking and prostitution and noticed a woman leaning close to the passenger side of a car that was stopped. *Id.* As the officer approached the vehicle, the woman "left abruptly" and the car began to move forward. *Id.* The car then quickly pulled off the road and onto the sidewalk. *Id.* From these facts, the officer concluded that the woman might have been soliciting prostitution. *Id.* The officer approached the vehicle and began his investigatory stop, the product of which led to an arrest and conviction for possession of crack cocaine. *Id.* In holding that the officer did have reasonable suspicion for conducting the stop, we held,

> We conclude there was a reasonable basis for [the officer] to conclude that he had observed solicitation for prostitution, given what he saw and where and when he saw it. A solitary female might lawfully pause and lean toward the window of a stopped vehicle at 2:45 a.m. in an area known for drug trafficking and prostitution, and then decide to walk away as a squad car approached; but that possibility is so slight that a reasonable police officer encountering that situation can probably conclude that something illegal (most likely solicitation for prostitution) is afoot.

*Id.* at 856.

As such facts sufficiently gave rise to reasonable suspicion in *Green*, so too do they justify the stop here. Based on his years of experience patrolling North Hill and his familiarity with the methods prostitutes use for solicitation, combined with the approach to and flight from the truck that he witnessed, Donohue had the necessary reasonable suspicion to conduct an investigatory stop of Luqman.

Finally, the scope of this stop was reasonably related to the situation at hand. *See Martin*, 289 F.3d at 397. Donohue asked Luqman as few questions as possible: he asked first if Luqman was soliciting prostitution, and then he asked to see Luqman's driver's license to verify his identity, both of which are acceptable questions. *See United States v. Byrd*, 47 F.3d 1170, *3 (6th Cir. 1995) (unpublished decision) (noting that an "officer may ask [a] detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions" (quoting *United States v. Obasa*, 15 F.3d 603, 607 (6th Cir. 1994))). Further, the stop was not lengthy, nor was it particularly invasive.

Given both Donohue's reasonable and articulable suspicion that criminal activity was afoot, and the limited scope of the stop, the district court correctly held that the officers did not violate Luqman's Fourth Amendment rights.

AFFIRMED.

———————————

**DISSENT**

———————————

CLAY, Circuit Judge, dissenting. Defendant Abdus Salaam Luqman appeals his conviction for being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Specifically, Defendant claims the firearm was discovered after his vehicle was unlawfully stopped by police, even though the police lacked reasonable suspicion that he was engaged in criminal activity. Although the district court held that the arresting officers had reasonable suspicion that Luqman was soliciting prostitution prior to stopping his vehicle, this holding rests on the clearly erroneous conclusion that Luqman was arrested in a neighborhood where prostitution is common. For the reasons that follow, I would vacate Luqman's conviction and order that any evidence arising out of the police stop of Luqman's vehicle be suppressed.

As the prosecution admitted at oral argument, Luqman was not arrested in an area noted for a high incidence of prostitution activity. Indeed, data introduced by the prosecution at trial demonstrates that over a one year period, only six prostitution arrests occurred in the vicinity of Luqman's arrest. Nevertheless, the majority now holds that we must treat the neighborhood where Luqman was arrested as a "high prostitution" area merely because a police officer tells us that it is. Although a court would ordinarily defer to the on-the-scene observations of the arresting police officer, it is not proper for a judicial fact-finder to do so where, as here, the record provides no objective support for the officer's conclusions. I therefore respectfully dissent.

**I.      Facts**

The facts of this case are partly as the majority describes them. Officers James Donohue and Angela Falcone were patrolling an area of Akron, Ohio known as North Hill at approximately 11:40 p.m. on the night of August 19, 2005, when Officer Donohue observed two women standing on a nearby street corner. As he approached this corner, Donohue saw one of the women run to a red pickup truck, driven by Luqman, which was stopped nearby. Believing that this could be a prostitution deal, Donohue made a U-turn to return to the site of the alleged deal. Although Officer Falcone was riding with Officer Donohue at this time, she testified that she did not see the alleged transaction because she was focused on her computer screen. As the police car approached the corner, the woman appeared to notice the approaching vehicle and ran back to the corner, still remaining within close proximity to the officers. Defendant drove away, and the officers, having witnessed nothing more, decided to pull him over.

The majority errs, however, in much of its interpretation of these facts. The majority concludes, relying merely on Officer Donohue's representation, that the North Hill neighborhood is a "known prostitution area." Maj. Op. at 2. Yet the prosecution's own evidence rebuts Donohue's claim. According to a chart introduced by the prosecution at trial, during the period from August 2004 until August 2005, only 24 prostitution arrests were made in an area several square miles in size surrounding the North Hill neighborhood, and only six of these arrests were in the immediate vicinity of Luqman's arrest. Moreover, this data was confirmed by the government's concession at oral argument that North Hill is not a high prostitution area. Regardless of what Officer Donohue may have claimed at trial, it is unclear what basis he had for viewing North Hill as rife with prostitution.

Two other facts regarding the circumstances of Luqman's arrest further diminish the likelihood that the police had reasonable suspicion to believe that Luqman was soliciting prostitution. First, Luqman was arrested near a number of residences, and the street corner where

the alleged prostitutes congregated was right across the street from a Rite-Aid Pharmacy.[1] Consequently, it could not be viewed as unusual for law-abiding citizens to be on the street at that location. Moreover, according to the police, neither woman was dressed provocatively, or otherwise presented the outward appearance of a prostitute. Based on the entirety of these circumstances surrounding Luqman's arrest, the district court abused its discretion in concluding that reasonable suspicion existed to stop Luqman's vehicle.

## II.     The Significance of Officer Donohue's Testimony

Officer Donohue testified that North Hill is a "high prostitution" neighborhood, and the majority concludes that Donohue's testimony is enough to make it so. Our precedents, and those of the Supreme Court, do not support such an abdication of the judicial role. The Fourth Amendment prohibition on unreasonable searches and seizures extends to vehicles stopped as part of a police investigation. *See Brendlin v. California*, 127 S.Ct. 2400, 2404 (2007). Accordingly, "the Fourth Amendment requires that the decision to stop [a vehicle] be based on something 'more substantial than inarticulate hunches.'" *United States v. Roberts*, 986 F.2d 1026, 1029 (6th Cir. 1993) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)).

Admittedly, in determining whether a stop was proper, we consider a law enforcement officer's description of events in light of that officer's "own experience and specialized training," permitting the officer "to make inferences from and deductions about the cumulative information available to [him] that might well elude an untrained person." *United States v. Martin*, 289 F.3d 392, 398 (2002). Yet even as we credit an officer's wisdom and training, we must also seek an objective basis for the officer's conclusions. Absent some foundation in objective reality, an officer's description of events bears no weight in a court of law. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) ("[T]he Fourth Amendment requires at least a minimal level of objective justification for making the stop.") We may look through an officer's eyes in evaluating whether a stop was based on reasonable suspicion, but we may not view the stop in a manner that exaggerates the trained officer's powers of perception.

Applying this standard to the facts of Luqman's arrest, it is clear that Officer Donohue lacked an objective basis for describing North Hill as a high prostitution area. According to the prosecution's own evidence, a mere six prostitution arrests occurred in a one year period in the vicinity of Luqman's arrest. As the prosecution conceded at oral argument, an urban area with only one such arrest every other month is hardly a hotbed of prostitution. Moreover, given such a modest incidence of prostitution arrests, it is questionable just what experience Officer Donohue could have been drawing on in concluding that North Hill is rife with prostitution. Presumably, he could not have personally witnessed a great deal of prostitution in North Hill, as there was hardly any prostitution to be seen; and he certainly could not have participated in many prostitution arrests in this neighborhood, inasmuch as such arrests rarely occurred. While there is no reason to doubt Donohue's good faith in testifying that he believed prostitution to be common in North Hill, his testimony simply does not meet the constitutional requirement that it have some basis in objective reality. *See id.*

The majority tells us that because Officer Donohue says that prostitution is common in North Hill, this Court must begin and end its inquiry with that statement. Our role is not so limited. Indeed, were an officer's mere say-so enough to establish an alleged fact as true, then the Fourth Amendment itself would be all but abandoned. Any police-initiated stop, no matter how unsupported by observation or experience, would be permissible because an officer could always

---

[1]There is some dispute as to the hours of this Rite-Aid, and Officer Donohue testified that he "couldn't tell" what time it closed. (J.A. 103)

construct a *post hoc* justification to satisfy this Court. Rather than delegate our responsibility to uphold the Fourth Amendment to individual police officers, I would apply the test the Supreme Court has provided us, and hold that an officer's interpretation of events must be supported by at least a "minimal level of objective justification." *Id.*

### III.    The Circumstances of Luqman's Arrest

Having determined that the record fails to establish that North Hill is a neighborhood of frequent prostitution activity, I turn now to the crux of Luqman's case. In determining whether police had reasonable suspicion that a suspect is engaged in criminal activity, this Court must examine the "totality of the circumstances" observed by police—thus, "courts must consider all the officer[']s observations, and not discard those that may seem insignificant or troubling when viewed standing alone." *Martin*, 289 F.3d at 398. Accordingly, this case rests upon whether, considering all of the events observed by the arresting officers, those officers had reasonable suspicion to believe Luqman might be guilty of soliciting prostitution.

The events which Officer Donohue witnessed were as follows: while driving in an area where prostitution is not particularly common, Donohue observed a woman speaking with the driver of a pickup truck. Donohue turned his car around to further observe the conversation, and as the police car approached at the scene of the conversation, the woman quit the conversation and returned to a nearby street corner. The woman was not dressed provocatively, and, other than speaking to a member of the opposite sex, she took no actions that were particularly evocative of a prostitute soliciting a client. Neither Officer Donohue nor Officer Falcone were able to identify her as a known prostitute.

I know of no Sixth Circuit case, and the majority cites none, which has made a finding of reasonable suspicion based on such a flimsy justification. In *United States v. Byrd*, No. 94-5301, 1995 WL 72299 (6th Cir. Feb. 21, 1995), this Court upheld a *Terry* stop which took place after police observed a "known prostitute approach the car and lean into the passenger side window to talk to the driver of the car." *Id.* at *1. In so holding, *Byrd* explained that reasonable suspicion was established by the combination of several facts: the woman was known to be a prostitute; she leaned into the car to speak to its driver; the arresting officer had warned her earlier that night to "get off the streets;" and the car was committing a likely traffic offense by sitting parked in the middle of a street. *Id.* at *3.

In *United States v. Martin*, a divided panel considered a more difficult set of facts involving a *Terry* stop and alleged prostitution. In *Martin*, officers observed a woman enter a vehicle driven by the defendant. 289 F.3d at 394. In holding that police had reasonable suspicion to stop the vehicle, the panel majority said that four facts combined to allow a *Terry* stop of the vehicle. First, the majority found that the woman's "dress and attire were typical of prostitutes." *Id.* at 399. Second, they noted that she was in an area "known for prostitution activity." *Id.* Third, the police testified that they recognized her as a woman who had previously been convicted of prostitution; and fourth, before entering the vehicle, the woman made a hand gesture associated with prostitutes soliciting customers. *Id.* In dissent, Judge Martin argued that these facts "simply leave too much speculation about whether [the woman] was engaged in loitering for prostitution purposes in this particular instance." *Id.* at 401 (Martin, J., dissenting).

Another, non-prostitution case is also helpful in resolving the instant manner. In *Illinois v. Wardlow*, the Supreme Court upheld a *Terry* stop of an individual who, while located in an area "known for heavy narcotics trafficking . . . looked in the direction of the officers and fled." 528 U.S. at 121–22. The officers in *Wardlow* subsequently chased this individual down a gangway and an alley, and eventually cornered him on a nearby street. *Id.* at 122. Taking into account both the high-crime area in which the fleeing suspect was discovered, and his sudden, unprovoked flight from the

presence of the officers, a sharply divided 5–4 Court held that the police had reasonable suspicion to search this suspect.  *Id.* at 125.

The instant facts present a much weaker case for a finding of reasonable suspicion than was present in *Byrd*, *Martin* and *Wardlow*.  Unlike *Martin* and *Wardlow*, Luqman was not stopped in an area with a high prevalence of prostitution or other crimes. Similarly, many of the other factors supporting a finding of reasonable suspicion in *Byrd* and *Martin* are not present in this case.  Neither Officer Donohue nor Officer Falcone testified that they recognized the woman who approached Defendant's truck as a known prostitute.  Furthermore, as Officer Donohue admitted in his testimony, the woman was not dressed provocatively, or in any other way which might distinguish her from any other woman.[2]  The woman did not lean into Defendant's vehicle, or otherwise make a gesture associated with prostitution.

Moreover, the facts of this case are distinguishable from the flight which occurred in *Wardlow*.  Unlike *Wardlow*, where the suspect spotted the officers, then immediately led them in a chase down a gangway, an alley and another street, 528 U.S. at 122, the instant case merely involves an incident in which a woman was speaking to Luqman, noticed an officer nearby, and then returned to a nearby street corner.  The woman did not flee the officers' presence; she simply moved from one place close to the officers, to another place, also close to the officers.  Contrary to the majority's characterization of this woman's actions as "[f]light from a known area of criminal activity," Maj. Op. at 4, the woman did not engage in flight of any kind, but simply moved from the street to the curb.  Had she actually intended to evade arrest by fleeing the scene of a crime, the alleged prostitute would have, at the very least, made some minimal effort to remove herself from the officers' immediate vicinity.

Indeed, the majority concedes in its opinion that the police in the instant case had less support for their decision to stop Luqman than existed in cases such as *Martin* and *Byrd*.  Maj. Op. at 4.  Nevertheless, the majority claims that Luqman's case is analogous to *United States v. Green*, 157 F. App'x 853 (6th Cir. 2005).  Our unpublished decision in *Green*, however, bears only a cursory resemblance to the instant case.  *Green* involved a criminal defendant who, while stopped in an area "known for drug trafficking and prostitution," was discovered speaking to a woman who was leaning into the passenger side of his car.  *Id.* at 855.  As a police car approached the scene of this conversation, the woman "left abruptly" and the car "quickly pulled off the road and onto the sidewalk."  *Id.*  Based on these facts, we held that police had reasonable suspicion to stop the vehicle and question its driver.  *Id.* at 856.

Essential to *Green*'s holding, however, is the fact that this stop took place in "an area known for drug trafficking and prostitution."  *Id.*  The majority is correct that, were the North Hill neighborhood a common destination for men seeking the companionship of prostitutes, then Luqman's arrest would rest on much firmer ground.  But comparing the instant case to *Green* does not change the nature of the North Hill area.  Luqman was arrested in an area where prostitution

---

[2]The majority notes Officer Donohue's testimony that prostitutes in Akron typically dress in "jeans and a sweatshirt or a T-shirt," rather than in more provocative clothing.  Maj. Op. at 2, n.2.  Yet even if we credit this testimony, it does nothing to bolster the majority's position.  It does not follow from the fact than prostitutes in Akron do not typically dress provocatively that a woman who is dressed unprovocatively can reasonably be suspected of being a prostitute.  Indeed, were we to accept such a ludicrous proposition, Akron police would have reasonable suspicion to stop virtually any woman as a suspected prostitute.  As we held in *Martin,* provocative dress is but one factor that can support reasonable suspicion that a woman is a prostitute.  289 F.3d at 399.  The majority now tells us that, in Akron, *un*provocative dress can also support such a conclusion.

simply is not all that common.[3] Luqman was speaking to an unremarkably dressed woman, and the supposed prostitute did not so much abruptly leave the scene of Luqman's arrest as she moved from a place in the street to another on a nearby sidewalk.[4] In light of the weak evidence supporting the officers' excuse for stopping Luqman's vehicle, I cannot conclude that this stop was supported by reasonable suspicion.

## IV.     Conclusion

The decision the majority hands down today is completely contrary to the courts' longstanding approach to suppression motions filed pursuant to the Fourth Amendment. By essentially adopting an unrebuttable presumption that an officer's description of the circumstances surrounding a *Terry* stop is accurate, the majority delegates the judiciary's fact-finding role to the arresting officers, who themselves have a stake in the outcome of the suppression proceedings. I cannot conclude that it is proper to so limit the courts' fact-finding function. Accordingly, I respectfully dissent.

---

[3]The majority claims that, despite the fact that the opinion in *Green* does not reveal the source of its conclusion that the arrest in that case took place in a high prostitution area, "[s]uch information must have come from the investigating officers in that case . . . ." Maj. Op. at 2, n.1. Even if we were free to speculate about matters not contained in the *Green* opinion, and even if our unpublished decision in *Green* bound this Court in deciding future cases, the instant case is distinguishable. In this case, the prosecution conceded at trial that a prostitution arrest only occurred in the North Hill neighborhood once every other month, and it subsequently conceded on appeal that North Hill is not a high prostitution area. We defer to an officer's description of the events surrounding an arrest only insofar as that description has some minimal basis in objective reality. *See Wardlow*, 528 U.S. at 123. We certainly should not blindly credit such a description when it is wholly inconsistent with the prosecution's own admissions.

[4]The majority claims that, because the suspected prostitute in *Green* "left abruptly" the scene of a supposed prostitution deal, and the suspected prostitute in this case "ran" to the nearby street corner, the two cases are materially similar. Maj. Op. at 2, n.3. Regardless of the pace of the woman's gait as she approached the street corner, the fact remains that she neither left the scene of her supposed deal with Luqman, nor made any attempt to flee the presence of the officers. The distinction between a woman who, upon noticing a nearby police officer, flees the scene of a suspected crime, and a woman who merely relocates to an adjacent street corner is the material distinction between Luqman's case and *Green*. 157 F. App'x at 855.