NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0451n.06

No. 09-6555

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jul 06, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | **ON APPEAL** FROM THE |
| Plaintiff-Appellee, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| ANTHONY J. JOHNSON, | ) | **O P I N I O N** |
| | ) | |
| Defendant-Appellant. | ) | |

BEFORE: NORRIS, ROGERS, and GRIFFIN, Circuit Judges.

ALAN E. NORRIS, Circuit Judge. Defendant Anthony Johnson appeals from the denial of his motion to suppress a pistol seized during an encounter with Nashville police officers. After his arrest, he was charged in a one-count indictment with being a felon in possession of a firearm, 18 U.S.C. § 922(g). After his motion to suppress was denied, he entered into a conditional plea agreement, which preserved his right to appeal the denial of his motion. The sole issue before us is whether the arresting officers had the requisite reasonable suspicion to conduct a *Terry* stop followed by a search of defendant's person. *See Terry v. Ohio*, 392 U.S. 1 (1968). For the reasons that follow, we conclude that they did and therefore affirm the judgment of the district court.

**I.**

The district court conducted a hearing in response to defendant's motion to suppress. Three individuals testified: Officer Darrell Morton, Detective David Layne, and defendant.

According to Morton, on January 6, 2009, he and Layne were sent by their sergeant to 631A Dew Street in Nashville to investigate allegations made by a confidential informant about drug trafficking and prostitution. This address is located in a housing project; the apartment in question is on the second floor, although the entrance is on the ground floor. The officers arrived on the scene together. Shortly after they arrived, they saw man walking towards the target apartment building about 40 yards away. Morton called out, "Hey, police, I want to talk to you." When accosted, the man – who turned out to be the defendant – knocked on the door "and demanded like, 'Let me in, open the door, let me in.'" Morton quickened his pace but defendant entered the building before Morton reached him. Within five seconds, however, defendant emerged from the residence.

Morton testified that he asked defendant where he lived. Defendant replied that he lived at 631 Dew, next door to the targeted apartment. When asked for identification, defendant "began to like fumble through his pockets appearing to look for ID." Morton asked defendant if he was carrying anything illegal. Morton received "no" for an answer and, according to the officer, defendant said, "You can check me." Before Morton could do so, defendant started to search himself. Morton intervened and began to pat down defendant's left side. He detected a bulge, which turned out to be keys. Morton also noticed that defendant was trying to "blade" him, that is, "he would . . . keep turning, like, at an angle so I couldn't get to the right side." Eventually, Morton noticed that "defendant's jacket was severely sagging from the outer pocket on the right side of the

jacket." According to Morton, "it was immediately apparent to me there was a handgun present, just from the feel of the object inside the jacket pocket." Morton alerted Detective Layne and they ordered defendant onto his back. Morton then retrieved a loaded, nine-millimeter handgun.

Defendant also testified at the hearing. He recalled being accosted by Officer Morton as follows: "[W]hen they first walked up, I was coming out of the house, and when he walked up, the first thing he said was, he said, 'Don't try to run; if you try to run, I'm going to beat your ass and ain't nobody around to see it.'" He also stated that he never gave either officer permission to frisk him, nor did he feel free to leave.

After hearing testimony and argument, the district court issued its decision in open court:

> Detective Morton testified that his . . . sergeant said that he had received information from one of his sources that there were drugs and guns at this particular residence.
>
> In addition to that information . . . Officer Layne . . . testified that this 631 Dew Street was known to them as an apartment where there had been other drug or suspicious activity in the past.
>
> . . . .
>
> They are in plain clothes in an unmarked car. But as they arrive, they put on . . . their bulletproof vests, and they say, "police," and according to Detective Morton, they both have badges on, which also identify them as police.
>
> As they are walking toward the apartment, they observe the defendant coming out from behind a building and approaching that apartment door that they are approaching for a knock-and-talk.
>
> They yell out to Mr. Johnson, who's . . . attempting to enter this apartment, "Police, we want to talk to you," in response to which the Court finds Mr. Johnson frantically is knocking on the door demanding to be let in, ignoring the officers calling out to him.

He enters the apartment and very quickly retreats from the apartment. At that point, the officers approach him and ask him for his identification. He begins to fumble for his identification.

. . . .

[H]e is fumbling. The court finds he is turning his left side to the officer, Officer Morton, who is searching him. And we had lots of demonstrations for the Court this morning of that search and the shielding of his right side.

. . . I found Detective Morton's testimony very credible in terms of the kind of search he was conducting and the shielding of the right side by the defendant.

. . . .

Officer Morton continued to search. They were trying to confirm the defendant's statement that he did not live at 631A Dew. He had told them he lived at 631 Dew.

At some point, when Officer Morton is able to see the right side of the defendant, he observes the – a sagging pocket, and suspects a gun, and finds a gun, at which point the defendant is placed on the ground and put in custody at that point.

I find that before that point, what we had was not a consensual encounter, but we had a very justified *Terry* stop based on reasonable suspicion given the location and the reason why the officers went there, given the fact that this apartment was known to them as having been involved in criminal activity before, and . . . reasonable suspicion very much substantiated by the fact that as they approached and called out to the defendant, he is frantically trying to get into the apartment.

. . . .

At any rate, he ignored the officers calling to him. He went in the apartment, quickly came out of the apartment. There's no doubt that it was the same person. Even according to the defendant's testimony, he's the one who went into the apartment and then went out of the apartment.

That is very suspicious behavior in the context of why the police were there. They had every reason to conduct a *Terry* stop. They had a reasonable inference that criminal activity might be afoot, and they are allowed to briefly stop the person, make reasonable inquiries aimed at confirming or dispelling their suspicions, and they may conduct a pat-down for weapons.

As Mr. Johnson was searching for his identification, the officers are certainly entitled to watch out for their own safety. Mr. Johnson was reaching into pockets, could well have had a weapon, and, in fact, did have a weapon, and so the officers were justified because it was a *Terry* stop and because of the actions of the defendant to do the pat-down themselves, at which point they found the gun.

. . . .

So for these reasons, the motion to suppress is denied.

Hearing Transcript at 55-59.

## II.

In reviewing a decision on a motion to suppress, we review factual findings of the district court for clear error and its application of the law to those findings de novo. *United States v. Garcia*, 496 F.3d 495, 502 (6th Cir. 2007). We "'must consider evidence in the light most likely to support the district court's decision[.]'" *Id.* (quoting *United States v. Marxen*, 410 F.3d 326, 328 (6th Cir. 2005)).

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). With respect to brief encounters between citizens and law enforcement officers, "the Fourth Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot." *Id.* (quotations omitted). When "justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21 (footnote omitted). This assessment requires facts to be judged by an objective standard;

a mere hunch is insufficient. *Id.* at 21-22. That said, we must give due weight to the officers' factual inferences in deference to their specialized training, which allows them to make deductions that "might well elude an untrained person." *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (quotations omitted). Even though a defendant might advance an innocent explanation for actions that the officers believed gave rise to "reasonable suspicion," we need not adopt the explanation; "the question is whether, when looking at the facts in total, the officers had reason to believe that criminal activity was afoot." *Luqman*, 522 F.3d at 617.

With these general teachings in mind, we turn to the facts found by the district court and ask ourselves whether they justified officers Morton and Layne in detaining defendant after he emerged from the apartment building. First, we believe it is important to stress that reasonable suspicion does not materialize merely because a person looked suspicious and was in a "high drug problem area." *Brown v. Texas*, 443 U.S. 47, 49, 52 (1979); *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."). In recent years, this circuit has repeatedly recognized that precept. *See, e.g., United States v. Johnson*, 620 F.3d 685, 692 (6th Cir. 2010) (suppressing evidence despite the fact that defendant was in a high crime area; it was 4 a.m.; officer received a 911 call; defendant was in the vicinity of an automobile mentioned in the call; defendant did not stop when called to by police; and he threw a duffel bag into another car); *United States v. Keith*, 559 F.3d 499, 506 (6th Cir. 2009) (although suspect was in an area known for drug-trafficking and appeared to move intentionally out of the line of sight of police, it was not enough to trigger "reasonable suspicion that a crime had been committed"); *United States*

*v. See*, 574 F.3d 309, 313-14 (6th Cir. 2009) (no reasonable suspicion even though suspect was in a high crime area at 4:30 a.m. in a dimly lit car with no front license plate); *United States v. Patterson*, 340 F.3d 368, 369-70 (6th Cir. 2003) (walking away from officers not enough even though another member of the group appeared to throw drugs away). In short, defendant's mere presence at the public housing complex in question is not enough to trigger reasonable suspicion; at most it is but one factor in determining whether the totality of the circumstances justified the decision of officers Morton and Layne to question him. *Johnson*, 620 F.3d at 692; *see also United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (while a high-crime area "may not, without more, give rise to reasonable suspicion, [it is] relevant to the reasonable suspicion calculus") (citations omitted).

However, in this case we have much more than mere presence in an area known by the officers to be prone to drug trafficking. First, the officers were directed to a particular address based upon information from a confidential informant. Second, shortly after their arrival, the officers saw defendant approaching that address and called out to speak with him. Rather than stop, which he had no legal obligation to do, defendant entered the building for fewer than five seconds before re-emerging. Third, even though defendant agreed when asked to produce identification, he "fumbled" when doing so and the officers observed that he appeared to shield one side of his body. And, fourth, Officer Morton noticed that defendant's coat was sagging, which he believed might indicate a weapon. All of these factors support the district court's conclusion that the officers had a reasonable, particularized suspicion to conduct a *Terry* stop followed by a pat-down. In our view, the critical factor is defendant's hurried entrance into the very building that the officers planned to

target followed by a remarkably quick exit. Because we must give "due weight" to the officers' factual inferences in deference to their specialized training, *Luqman*, 522 F.3d at 616, it is hardly a stretch to conclude that they reasonably thought that defendant's five-second visit was an attempt to warn drug traffickers of the police presence. At the very least, it is enough to justify the initial *Terry* stop. Thereafter, the manner in which defendant positioned his body while talking to the officers, coupled by his fumbling in an inside pocket, justified the pat-down that uncovered the weapon. *See United States v. Ellis*, 501 F.3d 958, 961 (8th Cir. 2007) (a protective frisk is justified if officer had reasonable suspicion that criminal activity is afoot).

**III.**

The judgment of the district court is **affirmed**.