**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0009n.06
Filed: January 7, 2009

**Nos. 08-5683/08-5685**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| JERRY L. CRAIG and BRADLEY S. CRAIG, | ) | |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE: RYAN, CLAY, and GRIFFIN, Circuit Judges.

GRIFFIN, Circuit Judge.

Defendants Jerry L. Craig and Bradley S. Craig, father and son, pleaded guilty to one count of theft of property with a value not exceeding $1,000, in violation of 18 U.S.C. § 661, and one count of knowingly concealing stolen personal property valued between $500 and $1,000, contrary to 18 U.S.C. § 13 and TENN. CODE ANN. § 39-14-103. In their plea agreements, defendants reserved the right to appeal the district court's denial of their motions to suppress. Following a bifurcated sentencing hearing, the district court sentenced each defendant to six months of imprisonment.

In these consolidated appeals, defendants now challenge the district court's order denying their suppression motions. Specifically, defendants contend that law enforcement officers lacked

-1-

reasonable suspicion to conduct an investigatory stop of their vehicle, thus rendering the stop and subsequent search of the vehicle unlawful under the Fourth Amendment and warranting suppression of evidence obtained as a result of the illegal stop. We disagree and affirm.

I.

The events giving rise to the charges against defendants occurred on August 14, 2007, in the parking lots of the Veteran's Administration Medical Center ("VAMC") in Johnson City, Tennessee. Vicki Webb, an employee at the hospital, was returning from lunch. Based on information provided to VAMC employees, she was aware that several vehicles had been stolen from the employee parking lots in the preceding year. As she passed through the parking lot, she noticed two men, later identified as the defendants in this case. She had not seen the men before and their behavior did not "look right" to Ms. Webb. She had a "gut instinct" that something was amiss because the men were loitering near the employee lot. Defendants did not have visible VAMC employee badges and were wearing shorts and sleeveless tops, attire that was not approved for VAMC employees. Ms. Webb testified that defendants' behavior was unusual because "usually people don't hang around like one area there too long. They either get in their cars or, you know, walk towards the hospital." She paused behind a parked truck, about forty-five feet away, to watch them.

Ms. Webb observed Jerry Craig standing near the motorcycle parking lot "looking around." The other man, Bradley Craig, walked to a gold Nissan Pathfinder, opened the rear hatch door, removed an unidentified object from what Ms. Webb perceived to be a tool box, raised his shirt, and tucked the item, which she assumed was a tool, under his shirt. He then walked back towards the

employee parking lot where Jerry Craig was standing. Ms. Webb thought it was "not normal that somebody sticks something up under their shirt." She used her cell phone to call the VAMC police dispatcher. She told the dispatcher about the two suspicious men in the parking lot. At the suppression hearing, she testified:

> I told [the dispatcher] my name and where I worked and I told her that I was, the parking lot that I was standing in, the one right in front of the hospital, and told her that I had observed somebody getting in the back of their vehicle and what seemed to be a tool, was a tool, and that they put it up under their shirt and shut the car back, car door back, and then that they walked back up towards the . . . employee parking, up towards the top where the motorcycles are at.

The dispatcher made an "All Units Call" on the radio, meaning that it was heard by any VAMC law enforcement officer. Significantly, there is no recording of that call, and the dispatcher did not testify at defendants' suppression hearing. The call was heard by Detective Jerry Shelton, who was in his nearby office at the time; by Sergeant Jeff Allen, who was in a patrol car; and by Captain Vaughn, another VAMC officer, who was also patrolling the premises in a marked vehicle. According to the testimony of the officers at the suppression hearing, the dispatcher reported that there were two "suspicious subjects up there [around Lot I] and they were going in and out of cars, walking back and looking in," and one of the subjects then took an unknown object out of one of the cars and placed it under his shirt.

Within one minute, in response to the dispatch, two marked police vehicles entered the parking lot from different locations. As they did so, Ms. Webb watched the two men get into the Pathfinder, back the vehicle out of the parking space, and immediately re-enter another parking space across from the one just vacated, where it sat momentarily before backing out and exiting the lot.

Upon hearing the dispatch, Detective Shelton walked immediately to the parking lot, where he was approached by Ms. Webb. Ms. Webb pointed to the Nissan and said, "That's them, that's them." As Detective Shelton radioed the description of the suspects and the vehicle to the officers in the patrol cars, he noticed that defendants were watching him. Instead of choosing the most direct exit from the parking lot, defendants immediately turned and drove behind a narrow row of trees, then followed a circuitous route out of the parking lot. The detective's suspicions were aroused by the unusual, seemingly evasive route taken by the Pathfinder. He reported the direction taken by the vehicle and was then picked up by Captain Vaughn in his patrol car.

Sergeant Allen, also responding to the call and listening to Detective Shelton's radio report, saw the gold Pathfinder approaching him. He activated his blue lights and motioned the driver of the Pathfinder to stop. Both defendants quickly exited the car and walked towards Allen, who was calling the dispatcher to obtain information about the vehicle registration. Alarmed by their quick approach, Allen told defendants to stop. At the same time, Detective Shelton and Captain Vaughn arrived at the scene and parked directly in front of the Pathfinder. Detective Shelton walked towards the men and, as he passed the Pathfinder, he could see what he considered to be unusual items inside, including a police scanner, tires covered by a tarp, and various tools in the passenger-side floorboard. According to Detective Shelton, both defendants had "extremely nervous demeanor[s]."

Detective Shelton asked Jerry Craig what he was doing on VAMC property. He answered that he was a veteran undergoing physical rehabilitation and pointed to Building 160 – not the building where rehabilitation is conducted and, in fact, a considerable distance from the correct

location (Building 200) and the parking lot where Ms. Webb first observed defendants.[1]  At this point, based on safety concerns, the officers handcuffed defendants and placed them in separate police cars.  Detective Shelton asked and was granted verbal consent to search the vehicle by Jerry Craig, who identified himself as the owner of the Pathfinder.

The search by Captain Vaughn and Sergeant Allen yielded two loaded pistols, one on the passenger floorboard and the other within reach of the driver's seat.  The officers also retrieved ammunition, automotive key cutters, blank automotive keys and lock cores, wheels and wheel covers that did not match the Pathfinder, and other stolen property from the Pathfinder.  Detective Shelton advised defendants of their *Miranda* rights and placed them under arrest for possession of firearms on federal VAMC property.

Defendants were charged in a six-count superseding indictment with, *inter alia*, auto burglary, theft and attempted theft, and possession of firearms in a federal facility.  Defendants moved to suppress the materials seized during the search of the Pathfinder.  An evidentiary hearing was held before a magistrate judge, who then issued a Report and Recommendation advising that the motions be denied.  The district court adopted the magistrate's Report and Recommendation in its entirety, over defendants' objections, and denied the suppression motions.  Subsequently, both defendants entered guilty pleas to one count of theft of property with a value not exceeding $1,000, in violation of 18 U.S.C. § 661, and one count of knowingly concealing stolen personal property

---

[1]A subsequent computer check revealed that neither Jerry L. Craig nor Bradley S. Craig were patients at the VAMC.

valued between $500 and $1,000, contrary to 18 U.S.C. § 13 and TENN. CODE ANN. § 39-14-103.

The plea agreements, however, reserved defendants' right to appeal the district court's order denying

their motions to suppress evidence. In May 2008, following bifurcated sentencing hearings, the

district court sentenced each defendant to six months of imprisonment. Defendants thereafter filed

these timely appeals.

II.

On appeal, defendants challenge the district court's denial of their motions to suppress

evidence obtained as a result of the investigatory stop. Defendants contend that because the law

enforcement officers lacked reasonable suspicion that criminal activity was afoot, the stop was

unlawful under the Fourth Amendment.[2]

When reviewing the district court's decision pertaining to a motion to suppress, we review

its factual findings for clear error and its legal conclusions de novo. *United States v. Blair*, 524 F.3d

740, 747 (6th Cir. 2008). The question whether reasonable suspicion of criminal activity has been

adequately established so as to justify a traffic stop is a mixed question of law and fact which we

review de novo. *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008). In reviewing

---

[2]It is undisputed that a seizure under the Fourth Amendment occurred in this case and that Bradley Craig, as a passenger in his father's vehicle, may contest the lawfulness of the stop. *See Brendlin v. California*, 127 S. Ct. 2400, 2403 (2007) ("When a police officer makes a traffic stop, the driver of the car is seized within the meaning of the Fourth Amendment . . . . We hold that a passenger is seized as well and so may challenge the constitutionality of the stop.").

the district court's denial of a motion to suppress, we consider the evidence in the light most favorable to the government. *United States v. Coffee*, 434 F.3d 887, 892 (6th Cir. 2006).

The Fourth Amendment's protections against unreasonable searches and seizures "'extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest.'" *United States v. Luqman*, 522 F.3d 613, 616 (6th Cir. 2008) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Nonetheless, if a law enforcement officer has reasonable suspicion that criminal activity may be afoot, the officer may conduct a brief traffic stop for investigative purposes to confirm or dispel his suspicions. *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968); *United States v. Butler*, 223 F.3d 368, 374 (6th Cir. 2000). Reasonable suspicion

> "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard. If an officer possesses a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts, he may conduct a *Terry* stop."

*Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (quoting *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006)).

"Reasonable suspicion for an investigative stop must be considered under the totality of the circumstances, considering 'all of the information available to law enforcement officials at the time.'" *Humphrey v. Mabry*, 482 F.3d 840, 846 (6th Cir. 2007) (quoting *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003)). Reasonable suspicion can be gleaned from the investigating officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred. *Dorsey*, 517 F.3d at 395. "Furtive

movements made in response to a police presence may also properly contribute to an officer's suspicions." *United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) (citations omitted).

It is well-settled that a tip from a reliable informant likewise may justify a *Terry* stop. *Smoak*, 460 F.3d at 779. Reasonable suspicion "requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person." *Caruthers*, 458 F.3d at 465 (quoting *Florida v. J.L.*, 529 U.S. 266, 272 (2000)). Tips from identified citizens have a high indicia of reliability, in part because such witnesses risk adverse consequences for providing faulty information. *Id.*

Moreover, law enforcement officers "may rely on police bulletins or flyers to detain persons based on reasonable suspicion that criminal activity is afoot 'to whatever extent the bulletin itself was based on articulable facts that would support reasonable suspicion.'" *Dorsey*, 517 F.3d at 396 (quoting *Feathers*, 319 F.3d at 849). Consequently, "if the dispatcher lacked sufficient information to satisfy the reasonable suspicion requirement, and the officers' subsequent observations did not produce reasonable suspicion, then the stop violated [the defendants'] Fourth Amendment rights." *Feathers*, 319 F.3d at 849.

"[I]ndividual factors, taken as a whole, [may] give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006) (quoting *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001)). Thus, "even a string of innocent behavior added together may amount to reasonable suspicion of criminal activity." *United States v. Richardson*, 385 F.3d 625, 631 (6th Cir. 2004).

Conversely, "conduct or circumstances that 'describe a very large category of presumably innocent [persons]' is not sufficient to constitute reasonable suspicion." *United States v. Jennings*, 985 F.2d 562, 1993 WL 5927, at *5 (6th Cir. 1993) (unpublished table decision) (alteration in original) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)).

Defendants argue that reasonable suspicion to conduct a *Terry* stop did not exist under the present circumstances, where the suspicion consisted merely of the vague "gut instinct" of a citizen informant, whose concerns were embellished in a police dispatch and misreported to the officers as ongoing "entries" by the suspects into "numerous" automobiles. Defendants maintain that Ms. Webb's observations – that she saw Bradley Craig walk to his vehicle, open the trunk, open a toolbox in the trunk, put an unidentified object under his shirt, and then walk away from his vehicle – did not provide law enforcement officers with specific and articulable facts that criminal activity occurred or was about to occur. As defendants point out, Ms. Webb admitted at the suppression hearing that she did not see defendants do anything overtly illegal. They further suggest that the actions she observed are more consistent with innocent rather than nefarious behavior, i.e., defendants could have been visitors or patients going for a walk through the expansive VAMC premises and Bradley Craig could have been placing an item such as a cell phone, sunglasses, keys, cigarettes, or even an Ipod, under his untucked shirt and into the waistband of his shorts.

Defendants further argue that the misleading dispatch that the suspects were "going in and out of cars, walking back and looking in," and "may have taken something out of one," did not

provide a legitimate basis for the investigatory stop. Based upon our consideration of the "whole picture," we disagree.

Unlike those cases in which we have found reasonable suspicion to be lacking because the tip or dispatch upon which a *Terry* stop was based was unduly vague, erroneous, or unreliable, and there was no other corroborating information of criminal activity, *see, e.g., Feathers*, 319 F.3d at 848-51; *Srisavath v. City of Brentwood*, 243 F. App'x 909, 917 (6th Cir. 2007), the observations of Ms. Webb and Detective Shelton, when considered along with the dispatch and other contextual considerations, supplied the requisite reasonable suspicion for the stop. As the magistrate judge correctly determined in his well-written Report and Recommendation:

> Ironically, the dispatcher did not accurately and fully report to the officers what the dispatcher was told by Ms. Webb . . . . However, what the VA police dispatcher did pass on to the officers was sufficient to justify a *Terry* stop, especially when considered with the other information known to the officers. The dispatcher said that there were "suspicious subjects" in Lot I, and that they were "in and out of vehicles." The remark about the suspects being "in and out of vehicles" obviously was the dispatcher's skewed attempt to report what Ms. Webb had told her about one of the men retrieving something from the Nissan Pathfinder. Nevertheless, the dispatcher was technically correct; the men were "in and out" of a car. The fact that it turned out to be one of the men's car is irrelevant to the question of reasonable suspicion. Most importantly of all, the dispatcher got it precisely right when she reported to the officers that one of the men had removed something from a car which he placed under his shirt. That maneuver is reasonably calculated to raise anyone's suspicion. One does not place something under his shirt unless he wants to hide the object from public view . . . .
>
> The officers were aware of the VA's long-standing problem of auto theft and burglary. This knowledge, coupled with the dispatcher's report and Ms. Webb's identification of the occupants of the [g]old Nissan Pathfinder as the two men she observed, caused these officers to reasonably suspect that the two men may have been engaged in illegal activity. Thus, it was lawful for the officers to briefly stop the Nissan for investigation.

The conclusion of the magistrate judge and the district court that there was reasonable suspicion to conduct an investigative stop of defendants' vehicle is supported by the facts and the law. The totality-of-the-circumstances analysis "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them 'that might well elude an untrained person.'" *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008) (quoting *Arvizu*, 534 U.S. at 273). Detective Shelton testified at the suppression hearing that the first-hand information provided by a reliable citizen witness (Ms. Webb), the dispatch call, and his own observations of defendants' wariness of his presence, followed by their abrupt change in direction upon his arrival and their seemingly evasive exit route from the parking lot, aroused his own suspicions that criminal activity was afoot. Importantly, all of this occurred in a setting plagued by auto thefts and burglaries. We thus agree with the district court that these particularized facts, conveyed to the other officers, justified the brief investigatory stop.

For these reasons, we affirm the judgment of the district court.