RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0292p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

  *v.*

MAURICE T. JOHNSON,

  *Defendant-Appellant.*

No. 09-5397

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 07-00093-001—J. Ronnie Greer, District Judge.

Argued:  August 4, 2010

Decided and Filed:  September 8, 2010

Before:  GUY, MOORE, and GRIFFIN, Circuit Judges.

_____

## COUNSEL

**ARGUED:**  Laura E. Davis, FEDERAL DEFENDER SERVICES OF EASTERN
TENNESSEE, INC., Knoxville, Tennessee, for Appellant.  Zachary C. Bolitho,
ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee.
**ON BRIEF:**  Nikki C. Pierce, FEDERAL DEFENDER SERVICES OF EASTERN
TENNESSEE, INC., Greeneville, Tennessee, for Appellant.  Zachary C. Bolitho,
ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, Donald Wayne
Taylor, ASSISTANT UNITED STATES ATTORNEY, Johnson City, Tennessee, for
Appellee.

  MOORE, J., delivered the opinion of the court, in which GRIFFIN, J., joined.
GUY, J. (pp. 17-20), delivered a separate dissenting opinion.

———————————

**OPINION**

———————————

KAREN NELSON MOORE, Circuit Judge.   On April 14, 2007, Newport, Tennessee police officers Scott Lamb and Rick Parton responded to a 4:00 a.m. 911 call asserting that "some people" connected with a blue Cadillac were "walking around" outside the caller's apartment.  Reaching the area within minutes, the officers observed a blue Cadillac parked across the street from the front of the caller's home.  They then saw a man who turned out to be the defendant, Maurice T. Johnson, carrying a bag and walking at a normal pace from a grassy area next to the caller's residence (that is, from the direction opposite the Cadillac) toward a white car on the street that ran alongside the residence.  The officers ordered Johnson, who was walking with his back toward them, to stop, but he did not respond.  Instead, Johnson proceeded at the same pace to the white car, walked around the front of the car and opened the passenger-side door, threw his bag inside, and stood outside the car with one hand on the door frame and the other atop the open door.   Johnson stood still but did not respond to subsequent commands to raise his hands.  Lamb and Parton then drew their weapons, and Johnson raised his hands.  The officers patted Johnson down, found a loaded gun, and arrested him.  Upon further searching his person, they found 3.8 grams of crack cocaine, a glass pipe, and various prescription pills.  The government later indicted Johnson on gun and drug charges.

Johnson moved to suppress the evidence as the fruit of an illegal seizure.  After an evidentiary hearing, the district court denied the motion, concluding that the officers had reasonable suspicion to detain Johnson in compliance with the Fourth Amendment. Thereafter, Johnson pleaded guilty to being a felon in possession of a firearm and to possession of crack cocaine with intent to distribute, reserving his right to appeal the denial of his suppression motion, and received a 192-month prison sentence.  He now raises his Fourth Amendment claim on appeal.  For the reasons discussed below, we

**REVERSE** the district court's denial of Johnson's motion to suppress and **REMAND** for further proceedings.

## I. BACKGROUND

At approximately 4:00 a.m. on April 14, 2007, a woman residing at an apartment run by the Newport Housing Authority called 911 and had the following conversation with the operator:

> OPERATOR:  911 Where is your emergency?
>
> CALLER:  [XYZ] Whitson Drive.
>
> OPERATOR:  What's the problem there?
>
> CALLER: Um.  They've finally had to come over here a couple of times before because I had some people coming by my house and they're back.
>
> OPERATOR:  What kind of vehicle are they in?
>
> CALLER:  They've got it parked now.  They're outside their vehicle walking around my house.
>
> OPERATOR:  And what kind of vehicle is it?
>
> CALLER:  A Cadillac.  Uh a blue Cadillac.

App'x at 4 (911 Call Transcript).  Sergeant Scott Lamb and Officer Rick Parton departed the police station and headed to the caller's residence in separate vehicles.  Neither Lamb nor Parton had heard the 911 call itself, but they were told by the dispatcher that the caller reported suspicious people around a blue Cadillac.[1]  At the hearing, Lamb and Parton testified that officers had responded to calls from the same caller earlier that evening and the previous day.  Doc. 27 at 8, 46.  Although Lamb stated that the earlier calls involved "some subjects that had been coming to her residence bothering her," *id.* at 7, and agreed with defense counsel that the caller stated "that those people had been

---

[1]At the evidentiary hearing, Lamb first stated that the dispatch reported "a suspicious male walking around an apartment," Dist. Ct. Doc. 27 at 7 (Suppression Hr'g Tr.), and Parton first stated that "[i]t was a suspicious black male walking around in the parking lot," *id.* at 45.  Both then acknowledged that the 911 call provided no descriptive information about the suspects except that there was more than one person near the caller's residence.  Lamb specifically conceded that the dispatch itself said nothing about race or gender.

there looking for somebody," *id.* at 24, 29, the basis for these characterizations was never brought out, and the district court found that "the nature of the prior complaints is not known," *United States v. Johnson*, No. 07-CR-93, 2008 WL 2718882, at *1 (E.D. Tenn. July 10, 2008) (unpublished opinion).

Two to three minutes after being dispatched, Lamb and Parton arrived at the area of the caller's residence, a duplex at the northeast corner of the intersection between the east-west street Whitson Drive and the north-south street Buda Road. Lamb testified that this was "a high drug trafficking area." Doc. 27 at 10. The officers observed a blue Cadillac parked in a parking space on Whitson Drive across the street from the caller's residence; it had a shredded, flat tire.[2] Lamb parked directly behind the Cadillac, and Parton parked directly behind Lamb. They alighted from their vehicles, scanned the area, and saw a person who turned out to be Johnson walking from a grassy area to the side of the duplex toward Buda Road, where a white car with a female driver was waiting. Johnson was not near the Cadillac,[3] and the officers did not observe anyone else walking or running in the area.

Johnson's back was toward the officers and he was twenty to thirty yards away when they observed him stepping from the grassy area onto Buda Road. Johnson was carrying a bag,[4] a fact that Lamb testified made him suspicious. Lamb and Parton yelled at Johnson, "[s]top, hey, hold on, wait a second," instructed him to "stay right there where he was" and to let them talk to him, and said "police" several times. *Id.* at 14, 33, 52. Johnson did not stop and instead continued walking at the same pace toward the

---

[2]At some point, Lamb ran the license plate for the blue Cadillac and discovered that it was registered to Johnson. The record does not specify whether he learned this information before the encounter with Johnson or after arresting Johnson. Lamb also testified that he had pulled over Johnson for running a stop sign in a blue Cadillac a month before the incident at Whitson Drive. However, Lamb did not indicate when he realized that he had previously encountered Johnson or when he remembered that Johnson had been driving a blue Cadillac. Lamb gave no indication that he recognized Johnson or associated him with the Cadillac at any point during the sequence of events on April 14, 2007.

[3]Contrary to Lamb's testimony, Parton testified that Johnson was walking *from the Cadillac* toward Buda Street. The district court resolved the conflicting testimony by finding that Parton "later clarified his testimony and stated that the defendant was in the grassy area near the apartment." *Johnson*, 2008 WL 2718882, at *2.

[4]The government describes the bag as a duffel bag, but neither the police officers' testimony nor the district court's opinion characterized the bag this way.

white car.  He crossed in front of the white car, opened the passenger-side door, threw his bag into the car, and then stood at the passenger-side door.  The officers ordered Johnson to put his hands up, but he did not do so.  According to Sergeant Lamb, Johnson "was sort of bracing himself in the door frame and on the top of the door."  *Id.* at 14. Lamb believed Johnson "was either thinking I'm going to jump in the car or I'm going to run."  *Id.*  The officers again ordered him to put up his hands, and again he did not. Finally, the officers drew their weapons and repeated their demand; at gunpoint, Johnson raised his hands.

On the officers' orders, Johnson then stepped out from the side of the vehicle, whereupon Lamb noticed a sagging bulge in the hand-warmer of the hooded sweatshirt that Johnson was wearing.  Around this time, Lamb observed Johnson "sort of bending over . . . , he bent over and actually put his hands towards his middle region of his, of his body, and was sorta slumped over and bending."  *Id.* at 16–17.  Lamb approached Johnson, patted him down, and discovered a loaded gun inside a sock in the hand-warmer.  The officers handcuffed Johnson and recovered from his person 3.8 grams of cocaine base, assorted pills, and a glass pipe.  A third officer arrived during the arrest to back up Lamb and Parton.

On October 9, 2007, the government charged Johnson in a five-count indictment with being a felon in possession of a firearm; possession of crack cocaine, alprazolam, and oxycodone with intent to distribute; and using and carrying a firearm during and in relation to a drug-trafficking offense.  Johnson filed a motion to suppress the evidence as obtained in violation of the Fourth Amendment.  After an evidentiary hearing, a magistrate judge recommended that the motion be denied.  The district court adopted the recommendation.  It concluded that although the 911 call "lacked even moderate indicia of reliability," the officers' initial attempt to speak to Johnson was permissible and Johnson's "actions after this initial request, when viewed in the totality of the circumstances, . . . provide[d] the officers with a particularized and objective basis for stopping the defendant."  *Johnson*, 2008 WL 2718882, at *3 (internal quotation marks omitted).

Pursuant to a plea agreement that preserved his right to appeal the district court's denial of his motion to suppress, Johnson pleaded guilty to being a felon in possession of a firearm and to possession of crack cocaine with intent to distribute. The government agreed to dismiss the other charges. The district court then sentenced Johnson as an armed career criminal to 192 months of imprisonment and 6 years of supervised release. Johnson timely filed a notice of appeal.

## II.  ANALYSIS

### A.  Standard of Review

Whether a seizure was reasonable under the Fourth Amendment is a question of law that we review de novo. *See United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008). When the district court has denied a motion to suppress, we must consider the evidence in the light most favorable to the government. *Id.* at 748.

### B.  Constitutionality of the Seizure

Johnson does not contend that the police could not have patted him down after detaining him, arrested him after finding the gun, or searched his person after arresting him. Rather, he argues that the officers lacked a constitutional basis to detain him in the first place. If that is so, then the gun and drugs must be suppressed as fruits of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471 (1963).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." U.S. Const. amend. IV. This protection extends to all seizures, including the brief investigatory stops described by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An officer may stop a person under *Terry* only if he "has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place*, 462 U.S. 696, 702 (1983).

Accordingly, the dispositive issue in this case is whether Sergeant Lamb and Officer Parton had reasonable suspicion that Johnson had committed, was committing,

or was about to commit a crime when they stopped him.  This issue involves two questions:  First, at what point did Lamb and Parton seize Johnson, triggering the protections of the Fourth Amendment?  Second, did the officers have reasonable suspicion at that point?

**1.  Point of Seizure**

A person is seized when an officer "by means of physical force or show of authority, has in some way restrained [his] liberty," *Terry*, 392 U.S. at 19 n.16, such that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988) (internal quotation marks omitted).  In addition, an individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment. *Brendlin v. California*, 551 U.S. 249, 254 (2007); *California v. Hodari D.*, 499 U.S. 621, 626 (1991).

A reasonable person in Johnson's position would not have felt free to leave when the officers ordered him to stop.  There were two officers, they had arrived in marked police cars, they announced themselves as police several times, and they yelled at Johnson to "stop" and "stay right there where he was" as they advanced toward him in the dead of night.  *See United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (listing "the threatening presence of several officers" and "the use of language or tone of voice indicating that compliance with the officer's request might be compelled" as relevant factors); *United States v. Smith*, 594 F.3d 530, 539 (6th Cir. 2010) (holding that "[o]nce Officer Putnick asked Smith to stop, a reasonable person would not have felt free to leave"); *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004) (holding that the defendant was seized when the officer instructed him to "just hang out right here for me, okay?").  At first, Johnson had his back toward the officers, but when he walked around the front of the white car and opened the passenger-side door of the vehicle, he would have been facing toward them.  At the very latest, then, a reasonable person in Johnson's position would not have felt free to leave upon reaching the far side of the white car and being in a position to observe that those ordering him to stop were police officers.

This is also the point at which Johnson was seized because it was then that he "yield[ed]" to the officers' yelled commands to "stop" and "stay right there where he was." *See Hodari D.*, 499 U.S. at 626. "[W]hat may amount to submission depends on what a person was doing before the show of authority . . . ." *Brendlin*, 551 U.S. at 262. Johnson was walking toward the white car before the officers yelled at him and ordered him to stop; he complied after reaching the car and putting his bag inside. Stopping after being ordered to stop triggers the Fourth Amendment. *See United States v. Jones*, 562 F.3d 768, 775 (6th Cir. 2009) (holding that defendant was seized when he "complied with [the officer's] order to stop"); *cf. Hodari D.*, 499 U.S. at 625–26 (holding that assuming officer's chase conveyed an order to stop, defendant was not seized while he was running away); *Smith*, 594 F.3d at 539 (holding that defendant attempting to pass by officers in apartment entryway was not seized because he did not "submit to [officers'] show of authority but, instead, tried throughout the encounter to push past the officers"); *United States v. Pope*, 561 F.2d 663, 668 (6th Cir. 1977) (holding that defendant was not seized when he "broke into a run at the moment that Agent Johnson identified himself as a DEA agent").

It would be an unnatural reading of the case law to hold that a defendant who is ordered to stop is not seized until he stops *and* complies with a subsequent order to raise his hands. If a subject is seized only if (1) "a reasonable person would have believed that he was not free to leave," *Hodari D.*, 499 U.S. at 628 (internal quotation marks omitted), and (2) the subject actually "yield[s]" to the message that he is not free to leave, *id.* at 626, then for a person who is moving, to "yield" most sensibly means to stop. To "yield" cannot mean to comply with each subsequent order made by an officer after the subject's initial compliance. Indeed, if a person stopped and raised his hands at an officer's command but failed to obey a further command to spread his legs or to lie on the ground, we would not say that he had not been seized initially. It is enough to submit to an officer's initial command to stop and to remain stopped.

It might be argued that Johnson had not truly yielded when he stood at the passenger-side door because he *looked* like he might flee. Such an argument would be

unconvincing. First, Johnson had in fact stopped. There is no dispute that he stood still at the passenger door. Second, the government cites no case suggesting that a person who has actually stopped in response to officers' commands but who looks like he *might* run has not submitted to an order to stop. Third, even if some such case exists, Sergeant Lamb offered precious little objective basis for his belief that Johnson "was either thinking I'm going to jump in the car or I'm going to run, one [or] the other." Doc. 27 at 14. The only testimony that Lamb provided in support of this belief is that Johnson "was sort of bracing himself in the door frame and on the top of the door." *Id.* But bracing much more strongly suggests holding one's position than preparing to flee. Moreover, both of Johnson's hands were on the car, apparently within Lamb's view, and it is unclear whether the car's engine was even running.[5] Without something more—perhaps moving into the car or signaling to the driver—there are inadequate grounds to conclude that Johnson considered fleeing.

For these reasons, we conclude that Johnson was seized when, after being ordered to stop by Lamb and Parton, he stopped and stood at the passenger-side door of the white car.

### 2. Lack of Reasonable Suspicion

As noted, an officer may conduct an investigatory stop only if he "has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *Place*, 462 U.S. at 702; *see also Smith*, 594 F.3d at 536. Reasonable suspicion "must be based on specific, objective facts," *Brown v. Texas*, 443 U.S. 47, 51 (1979), and requires that "the detaining officers have a particularized and objective basis for suspecting the particular person stopped of criminal activity," *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). The determination of whether reasonable suspicion existed must be based on the totality of the circumstances in place at the time of seizure. *Arvizu*, 534 U.S. at 273; *United States v. McCauley*, 548 F.3d 440, 443 (6th Cir. 2008).

---

[5]Lamb testified that the white car was "stopped" on Buda Street, but did not specify whether it was on or off, parked or standing. Doc. 27 at 12, 28.

That totality of the circumstances consisted of the following facts when Johnson submitted to the officers' orders to stop: (1) Johnson was in a high drug-trafficking area; (2) it was 4:00 a.m.; (3) the officers were responding to a 911 call; (4) two or three minutes after the 911 call, the officers observed Johnson twenty to thirty yards from the blue Cadillac referenced in the call and near the residence from which the call was made; (5) the officers did not notice anyone else in the area, besides the driver of the white car to which Johnson was headed; (6) Johnson did not stop when called to by the officers and instead continued walking toward the white car; and (7) he was carrying a bag, which he threw into the white car. As we explain, these circumstances were insufficient to allow an officer reasonably to suspect Johnson of criminal activity.

The first two facts—presence in a high-crime location and the lateness of the hour—"may not, without more, give rise to reasonable suspicion," but they may be considered in the totality of the circumstances. *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). Nonetheless, these are "context-based factors that would have pertained to anyone in the [area] at that time and should not be given undue weight." *United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009); *see also Caruthers*, 458 F.3d at 467 (observing that "labeling an area 'high-crime' raises special concerns of racial, ethnic, and socioeconomic profiling"). This caveat is especially appropriate in this case, because while Lamb testified that the area was known for drug trafficking specifically, he observed no conduct from Johnson consistent with drug activity. *Cf. United States v. Paulette*, 457 F.3d 601, 602, 606 (6th Cir. 2006) (holding that officers had reasonable suspicion that defendant in high drug-crime area was engaged in criminal activity based on his hand movements, which were consistent with a hand-to-hand drug transaction).

The strength of the third, fourth, and fifth facts turns on the content and reliability of the call. As the district court concluded, the 911 call "was too vague and 'provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility,' and it lacked even 'moderate indicia of reliability.'" *Johnson*, 2008 WL 2718882, at *3 (quoting *Florida v. J.L.*, 529 U.S. 266,

271 (2000)).  The caller did not identify the suspects beyond calling them "some people," and thus the police had no descriptive information or anticipated behavior by which to identify a particular suspect on the scene.  Moreover, the 911 caller provided insufficient reason to believe that Johnson, even if he was one of the "people" she had called about, had committed, was committing, or was about to commit a crime.  The caller stated only that "some people" who had been near her home earlier were "back" and were "outside their vehicle walking around my house."  App'x at 4.  Reasonable suspicion "requires that a tip be reliable *in its assertion of illegality*, not just in its tendency to identify a determinate person."  *J.L.*, 529 U.S. at 272 (emphasis added).  In *Feathers v. Aey*, 319 F.3d 843 (6th Cir. 2003), we held that officers who seized an individual based on a 911 caller's report that "a white male with a beard on a porch on North Howard Street had pointed something at the caller and told the caller to shut up" lacked reasonable suspicion because the "tipster did not even allege *any* criminal activity."  *Id.* at 846, 850.  In *United States v. Cohen*, 481 F.3d 896 (6th Cir. 2007), we held that a silent 911 hang-up call suggested that "there might be an emergency, which might or might not include criminal activity," and that this possible suggestion of "a limited assertion of illegality" was unreliable absent some corroboration of criminal activity.  *Id.* at 900.  The same observations govern here:  the caller stated only that people were walking around her home, not that she observed any incriminating behavior or that she suspected them of any criminal conduct in particular.[6]  To the extent that the caller suggested a limited, unspecified possibility of criminal activity, her tip could not be considered reliable unless the officers' own observations raised the prospect of criminal activity.  For these reasons, the fact that Johnson was near the caller's home and

---

[6]This fact distinguishes the instant case from the four out-of-circuit cases cited by the government, all of which involved a report that a specific crime had taken place.  *See United States v. Fisher*, 597 F.3d 1156, 1157 (10th Cir. 2010) (911 call of shots fired, followed by in-person description of suspect responsible for the shooting); *United States v. Valentine*, 232 F.3d 350, 352, 354 (3d Cir. 2000) (face-to-face tip of a man with a gun); *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir. 1989) (911 call of a burglary in progress); *United States v. Moore*, 817 F.2d 1105, 1106 (4th Cir. 1987) (silent burglar alarm triggered).  We have previously distinguished one of these cases, *Moore*, on precisely this ground.  *See Cohen*, 481 F.3d at 899–900 (explaining that "a silent burglar alarm is arguably a more reliable indication of criminal activity than is a silent 911 hang-up call" that neither alleged any crime nor described a determinate person).

the blue Cadillac when the police arrived deserves "little weight in the reasonable-suspicion calculus." *Caruthers*, 458 F.3d at 466.

We come next to the facts that might cast suspicion on Johnson in particular, as opposed to anyone who happened to be in the area—the sixth and seventh facts. The district court concluded that continuing to walk to the awaiting white car after being instructed to stop and throwing his bag into the car "could indicate flight and does indicate evasive behavior." *Johnson*, 2008 WL 2718882, at *4. We disagree.

It is undisputed that the officers lacked reasonable suspicion to seize Johnson when they called for him to stop and that Johnson was entitled to keep walking. Nonetheless, the government insisted at oral argument that ignoring an unconstitutional order contributes to reasonable suspicion. We seriously doubt the wisdom of labeling reasonably suspicious the proper exercise of one's constitutional rights. *See Wardlow*, 528 U.S. at 125 ("[W]hen an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business.") (citing *Florida v. Royer*, 460 U.S. 491, 498 (1983)).

Moreover, there was nothing independently suspicious about Johnson's continuing to walk toward the white car when Lamb and Parton approached. The Supreme Court has held that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. In *Wardlow*, the Court held that unprovoked, "[h]eadlong flight" upon noticing the police "is the consummate act of evasion." *Id.* Following *Wardlow*, we held that "the speed of the suspect's movements" to get away "may be relevant to the totality of the circumstances" for reasonable suspicion, *Caruthers*, 458 F.3d at 466, and we have considered the abruptness and other evasive characteristics of a suspect's departure upon noticing the police to determine whether his reaction contributes to reasonable suspicion. *Compare United States v. Pearce*, 531 F.3d 374, 382 (6th Cir. 2008) (finding reasonable suspicion when, upon seeing police officer, the defendant "hunch[ed] over, place[d] his right hand in the small of his back, and start[ed] backing away" as though he "had a weapon and was getting ready to fire" (internal quotation marks omitted)); *United States v. Luqman*, 522

F.3d 613, 617 (6th Cir. 2008) (finding reasonable suspicion that defendant solicited prostitution "when the woman who had approached [his] truck ran back to the corner, and [his] truck moved forward, as the police vehicle approached"); *Caruthers*, 458 F.3d at 466-67 (finding reasonable suspicion when a defendant "hurried away in a semi-running manner" and "hunched down near a wall" as if to conceal a weapon or contraband upon being approached by an officer); *Paulette*, 457 F.3d at 602 (finding reasonable suspicion when defendant who had just engaged in a hand-to-hand transaction in a high-crime area "quickly moved his hand to his pocket and began to walk away from the officers" upon noticing their approaching squad car); *United States v. Davis*, 331 F. App'x 356, 358, 360 (6th Cir. 2009) (unpublished opinion) (finding reasonable suspicion when a defendant who emerged from a known drug house "had a deer-in-the-headlights kind of look and proceeded to pick up the pace" to cross the street upon seeing two officers on patrol (internal quotation marks and brackets omitted)); *United States v. Muhammad*, 316 F. App'x 429, 430–31 (6th Cir. 2009) (unpublished opinion) (finding reasonable suspicion when defendant, in response to police officer approaching him, walked away, entered the stairwell of a nearby apartment building, and bent over as though concealing something there); *United States v. Craig*, 306 F. App'x 256, 262 (6th Cir. 2009) (unpublished opinion) (finding reasonable suspicion based on defendants' "abrupt change in direction upon [the officer's] arrival" and their circuitous, "seemingly evasive exit route from the parking lot"); *and United States v. Connally*, Nos. 91-6401/6440/4441, 1993 WL 8151, at *1-2 (6th Cir. Jan. 15, 1993) (unpublished opinion) (finding reasonable suspicion when, upon seeing the police, man standing at van window in location known for drug transactions threw something in the van, immediately turned, and quickly walked away while the van also quickly pulled away), *with United States v. Keith*, 559 F.3d 499, 505 (6th Cir. 2009) (finding no reasonable suspicion when pedestrian and car moved from one side of liquor store to other side, out of officers' sight, after pedestrian glanced twice at officers because the suspects' conduct was "more ambiguous than the examples of 'evasion' that have contributed to reasonable suspicion in other cases"); *United States v. Patterson*, 340 F.3d 368, 372 (6th Cir. 2003) (stating that "walking away from the police when they got out of their unmarked car

constitutes a factor to be outrightly dismissed"); *and Patterson v. City of Cleveland*, No. 97-4226, 1999 WL 68576, at \*6 (6th Cir. 1999) (unpublished opinion) (finding no reasonable suspicion when two men who appeared to exchange something separated their hands and "walked quickly up the street when a police car appeared").

As the above-cited cases demonstrate, there is an ongoing debate about the circumstances under which a person responding to the arrival of police will raise suspicion of wrongdoing. *This case*, however, does not present even a close question. Johnson did not change course or otherwise react suspiciously to the police. He did not react *at all*. Instead, his trajectory remained constant: he continued walking in the manner he had been walking (according to the district court, "at a normal pace," *Johnson*, 2008 WL 271888, at \*4) and in the direction he had been walking when the officers first observed him. Upon reaching the white car, he opened the passenger-side door and put his bag inside, undoubtedly what he had intended to do even before the police arrived. Johnson's conduct was the quintessential example of "going about one's business"—protected, unsuspicious conduct that the Supreme Court has characterized as "the opposite" of flight. *Wardlow*, 528 U.S. at 676.

In the rare cases in which we have found reasonable suspicion to stop a defendant who did not change course but simply continued doing what he was already doing when the police arrived, the defendant's initial conduct was itself suspicious. *See, e.g.*, *Watkins v. City of Southfield*, 221 F.3d 883, 887-89 (6th Cir. 2000) (defendant was driving at half the speed limit in an area victimized by several recent robberies, suggesting that he was either intoxicated or casing the neighborhood). Here, there was nothing suspicious about Johnson's walk toward the white car, least of all the fact that he carried a bag (notwithstanding Sergeant Lamb's incredible testimony to that effect, *see* Doc. 27 at 39). To say otherwise would be to contract dramatically the scope of the Fourth Amendment for all men and women who work an early shift or who schedule an early-morning trip to the airport—or at least those unfortunate enough to live in high-crime areas.

We note that the district court relied heavily on two further circumstances, which our dissenting colleague also invokes. The district court found it "[m]ost important[]" that Johnson did not raise his hands when ordered to do so and "also very important" that Johnson moved his hands toward his midsection at some point. *Johnson*, 2008 WL 2718882, at *4. Because reasonable suspicion for a stop cannot be based on events that occur after the defendant is seized, the district court erred in considering these actions. *See McCauley*, 548 F.3d at 443; *Blair*, 524 F.3d at 751. The officers did not command Johnson to raise his hands until after he complied with their demand that he stop and stood still outside the white car. Meanwhile, Lamb clearly testified that Johnson's movement toward his midsection occurred after Johnson had stopped *and* raised his hands at gunpoint. *See* Doc. 27 at 14–15 ("[W]e asked him to put his hands up . . . . [E]ventually he did comply with us and stepped out from the side view of the, the door that was open, *at which time* I saw a large sag in his . . . hoodie sweatshirt pocket." (emphasis added)); *id.* at 16-17 ("[W]henever we asked him to come out from behind the car, he bent over and actually put his hands towards his middle region of his, of his body, and was sorta slumped over and bending around whenever I came up."). These facts therefore could not form any part of the reasonable suspicion needed to seize Johnson.

In sum, the totality of the relevant circumstances consisted of contextual factors that would have applied to anyone in the neighborhood; a 911 call that made no specific allegation of criminal activity, provided no predictive information about the suspects, and at most suggested that someone was doing something suspicious in the area; Johnson's reasonable failure to comply with commands to stop until he had reached the white car; and the fact that Johnson did not flee or otherwise react suspiciously to the officers' presence, but rather continued along the precise trajectory he was following when the officers arrived. While facts susceptible of innocent explanation may amount to reasonable suspicion when taken together, *Arvizu*, 534 U.S. at 277–78, that oft-cited principle "is not a talisman in whose presence the Fourth Amendment fades away and disappears," *Coolidge v. New Hampshire*, 403 U.S. 443, 461 (1971). The facts involved here fall far short of the constitutional standard. In short, the officers lacked reasonable suspicion to detain Johnson.

### III.  CONCLUSION

In this case, Sergeant Lamb and Officer Parton stopped an individual who turned out to be engaged in criminal conduct.  Nonetheless, the Fourth Amendment prevents the government from using the incriminating evidence they recovered.  Because the totality of the circumstances did not provide "a particularized and objective basis for suspecting [Johnson] of criminal activity," *Cortez*, 449 U.S. at 417–18, and because "[t]he Fourth Amendment simply does not allow a detention based on an officer's 'gut feeling' that a suspect is up to no good," *United States v. Urrieta*, 520 F.3d 569, 575 (6th Cir. 2008), we conclude that Lamb and Parton seized Johnson without reasonable suspicion of criminal activity in violation of the Fourth Amendment.  If a stop is not justified at its inception, any evidence resulting therefrom must be excluded.  *See Blair*, 524 F.3d at 750.  Thus, we **REVERSE** the district court's order denying Johnson's motion to suppress and **REMAND** the case for further proceedings.

————————

**DISSENT**

————————

RALPH B. GUY, JR., Circuit Judge, dissenting.  I would affirm the district court's denial of the defendant's suppression motion, which argued that the evidence seized was the "fruit" of an unconstitutional *Terry* stop.  I depart from the majority on the questions of precisely when the defendant was seized, and whether there was reasonable suspicion at the point of seizure sufficient to justify a brief investigatory detention consistent with *Terry* and its progeny.

As the majority emphasizes, the defendant was within his rights to ignore the officers' inquiry, and a "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Florida v. Bostick*, 501 U.S. 429, 437 (1991).  However, even when the officers have no basis for suspecting a particular individual, they "do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen." *United States v. Drayton*, 536 U.S. 194, 200 (2002).  After the officers first called out to defendant to "hold up," he continued walking, crossed in front of the waiting car, opened the door of the passenger side, and threw the bag he had been carrying into the vehicle.  The officers, continuing to approach, called in a loud voice that they wanted to talk to him and demanded that he stop and put his hands up.  The defendant, although now facing the officers, did not comply and instead braced himself "in the door frame and on the top of the door."  The majority concludes that this is the point at which the defendant was seized for Fourth Amendment purposes.

While I agree that a reasonable person in defendant's situation would not have felt free to leave once the officers demanded that he stop and put his hands up, that, of course, is "a *necessary*, but not a *sufficient* condition for seizure–or, more precisely, for a seizure effected through a 'show of authority.'" *California v. Hodari D.*, 499 U.S. 621, 628 (1991).  A seizure "requires *either* physical force . . . *or*, where that is absent,

*submission* to the assertion of authority."  *Id*. at 626.  "[T]here is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned."  *Brendlin v. California*, 551 U.S. 249, 254 (2007).  In this case, the defendant had stopped walking away; but he did not simply "stand still."  The evidence, viewed—as it must be—in the light most favorable to the government, indicated indecision on the defendant's part about whether to flee or to submit to the officers' show of authority as the officers closed the distance and were yelling for defendant to stop and put his hands up.  The officers testified that as they approached, the defendant acted like he was thinking about whether to jump into the car or take off running.  While defendant did not do either, he also did not submit to the officers' show of authority.

The transcript, as well as the district court's factual findings, reflect that the defendant also made suspicious movements as he stood in the frame of the open car door.  Specifically, although the exact sequence was not clear, the uncontradicted evidence was that the officers saw the defendant bending forward and reaching for his middle region—where the loaded firearm was found—as they closed in and *before* he complied with their demands that he put his hands up.  I agree that the proper focus is not whether the defendant complied with the officers' successive demands, but at what point he actually submitted to the officers' show of authority.  In this case, I conclude that the defendant did not unambiguously submit to the officers' show of authority until he raised his hands and turned to come away from the open car door.  *See United States v. McCauley*, 548 F.3d 440, 442 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1601 (2009) (holding seizure effectuated when passenger who jumped out of stopped vehicle submitted to the officer's show of authority by raising his hands).  It is at this point of submission that we must determine whether there was reasonable suspicion.  *Id*. at 443.

Reasonable suspicion "'requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard.'"  *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008) (citation omitted).  As the district court found, the 911 call *alone* did

not provide reasonable articulable suspicion that criminal activity was afoot. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion, however, is determined from the totality of the circumstances and "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citation omitted). "The court's evaluation and rejection of . . . factors in isolation from each other does not take into account the 'totality of the circumstances.'" *Id*. at 274.

Contextual considerations—time, place, and citizen complaint—"may not, without more, give rise to reasonable suspicion . . . [but] they are relevant to the reasonable suspicion calculus." *United States v. Caruthers*, 458 F.3d 459, 467 (6th Cir. 2006). The caller's apartment was known to the officers to be in a high drug trafficking area. The officers were responding at 4:00 a.m., to a repeat call from a known caller reporting that "some people" were "back," referring to the earlier calls, and that they were walking around outside her home. She also said the "people" had arrived in a blue Cadillac. The officers responded in separate police cruisers within two or three minutes of the 911 call and saw a blue Cadillac with a flat tire across the street from the caller's apartment. Sergeant Lamb testified that the caller's apartment had one side toward Buda and another toward Whitson, with a grassy area separating the apartment from Buda. The defendant was quickly observed 20 to 30 yards away, "leaving a grassy area next to the apartment [from which they knew the 911 call had come] and stepping onto [Buda] Street where a vehicle was stopped." Under the circumstances, it was not only permissible but also reasonable for the officers to attempt to speak to the defendant.

Unlike the majority, I would not dismiss from consideration the defendant's actions between the time he threw the bag into the waiting car and when he unambiguously submitted to the officers' show of authority. Defendant exhibited what the officers interpreted as momentary indecision about whether to flee, but he did not get into the car or attempt to run away. Rather, as the officers closed in, yelling for defendant to stop and put his hands up, the officers drew their weapons and the

defendant bent forward and reached his hands toward his "middle region." Although defendant's behavior—bending and reaching for his front—was susceptible of innocent explanation, it also could reasonably be viewed as an attempt to conceal a weapon or other contraband from the officers. *Arvizu*, 534 U.S. at 277 ("A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct."). When the factors are taken together, I conclude that the totality of the circumstances at the time the seizure occurred—including the time, the place, the 911 call, defendant's proximity to the apartment, the inference that defendant was about to leave the area, the indication that defendant might flee once he saw the police, and the defendant's movements suggesting concealment—give rise to a reasonable particularized suspicion sufficient to justify the brief detention that followed. Finding no "taint" from the initial stop, I respectfully dissent.